**MONFORT OF COLORADO, INC., Plaintiff,**

v.

**CARGILL, INC. and Excel Corporation, Defendants.**

Civ. A. No. 83–F–1318.

United States District Court, D. Colorado.

Dec. 1, 1983.

---

William C. McClearn, James E. Hartley, Timothy M. Rastello and Marcy G. Glenn of Holland & Hart, Denver, Colo., for plaintiff, Monfort of Colorado, Inc.

Robert F. Hanley, Denver, Colo., Alan K. Palmer, Washington, D.C., and David R. Eason of Morrison & Foerster, Denver, Colo., for defendants, Cargill, Inc. and Excel Corp.

## MEMORANDUM OPINION AND ORDER

SHERMAN G. FINESILVER, Chief Judge.

Plaintiff Monfort of Colorado, Inc. ("Monfort") commenced this lawsuit to en-

join the acquisition by defendants, Cargill, Inc. ("Cargill") and Excel Corporation ("Excel"), of the Spencer Beef Division of Land O'Lakes, Inc. ("Spencer" or "Spencer Beef"). Monfort claims that the proposed acquisition would violate Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiff originally moved for preliminary injunction as a result of the imminence of the acquisition. Defendants, however, agreed to postpone consummation of the proposed acquisition and the parties stipulated to a consolidated preliminary injunction hearing and trial on the merits pursuant to Rule 65(a) of the Federal Rules of Civil Procedure.

## I. ISSUES PRESENTED AND SUMMARY OF HOLDINGS

This lawsuit presents the following issues which are, to a great extent, unique to the beef industry: whether Monfort, a competitor of the principal acquiring party, Excel, has standing to challenge the acquisition of Spencer by Excel; what are the product and geographic boundaries for the relevant markets in the beef industry when analyzing the proposed acquisition under Section 7 of the Clayton Act; whether the proposed acquisition would tend to lessen competition in violation of federal law; and whether the proposed acquisition must be enjoined pursuant to Section 16 of the Clayton Act to prevent threatened violations of the Act.

The court has carefully considered the evidence, exhibits, briefs and arguments of counsel and has thoroughly reviewed the case file. For the reasons stated below, the court finds that Excel's proposed acquisition of Spencer Beef should be enjoined in that it would tend to harm competition in violation of Section 7 of the Clayton Act.

In sum, we find and conclude as follows:

1. Monfort has standing to challenge the proposed acquisition;

2. The twelve state regional market for the procurement of fed cattle and the national market for the sale of boxed beef constitute economically significant markets or submarkets within the beef industry for purposes of analyzing the proposed acquisition under Section 7 of the Clayton Act;

3. The proposed acquisition may substantially lessen competition in the regional market for the procurement of fed cattle and the national market for the sale of boxed beef in violation of Section 7 of the Clayton Act; and

4. Monfort is threatened with significant loss or damage within the meaning of Section 16 of the Clayton Act as a result of the proposed acquisition, and injunctive relief should enter to prevent threatened violations of the Act.

Accordingly, the court finds that the defendants' proposed acquisition of Spencer Beef should be PERMANENTLY ENJOINED.

The following constitute the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## II. JURISDICTION AND BACKGROUND

To better understand the issues and resolution of the case, an overview of the meat packing industry is helpful. This background is included in this section regarding jurisdiction and background analysis.

■ Each of the defendants is engaged directly in the sale, purchase or distribution of goods or services in interstate commerce. The production and sale of fresh beef constitute trade and commerce in and among several states and the District of Columbia. Accordingly, the court has subject matter jurisdiction over plaintiff's claims as may be required by either Section 7 of the Clayton Act or Section 1 of the Sherman Act. In addition, Defendants Cargill and Excel have admitted the personal jurisdiction of this court and have admitted that venue lies in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) and (c).

Plaintiff Monfort is a Delaware corporation with its principal place of business in

Greeley, Colorado. Monfort is engaged in the production, transportation and sale of cattle, beef and lamb products. Monfort has plants for cattle slaughter and beef fabrication in Greeley, Colorado, and Grand Island, Nebraska. In addition, Monfort owns and operates commercial feedlots in Kuner and Gilcrest, Colorado.

Defendant Cargill is a Delaware corporation with its principal place of business in Minneapolis, Minnesota. Cargill operates more than 150 subsidiaries in at least 35 countries. Cargill's subsidiaries engage in various pursuits, including grain merchandising and processing, cattle feeding and beef, poultry and egg processing.

Defendant Excel is a wholly-owned subsidiary of Cargill. It is a Delaware corporation and has its principal place of business in Wichita, Kansas. Excel was formerly known as MBPXL. MBPXL was formed in 1974 as a result of a merger of Missouri Beef Packers and Kansas Beef Industries. In 1979, MBPXL was acquired by Cargill and in 1982 its name was changed to Excel Corporation.

Defendant Excel is engaged in the slaughter and fabrication of beef and beef by-products. Excel has five plants engaged in beef slaughter and fabrication: Rockport, Missouri; Friona, Texas; Plainview, Texas; Dodge City, Kansas; and Cozad, Nebraska. A sixth plant in Wichita, Kansas, is engaged only in beef fabrication. It is significant that Excel is the second largest beef packer in the United States. Ex. 19 at 5 (MBPXL Annual Report 1981–82).

On June 17, 1983, Excel signed an agreement to acquire the Spencer Beef Division of Land O'Lakes, Inc. Land O'Lakes, Inc. is an agricultural cooperative with its principal place of business in Arden Hills, Minnesota. Spencer Beef is engaged in the slaughter of cattle and the fabrication of beef. It has plants in Spencer and Oakland, Iowa, and Schuyler, Nebraska. The Oakland and Schuyler plants have facilities for both slaughter and fabrication. The Spencer plant is engaged only in cattle slaughter. The Schuyler plant has been closed since late December of 1982. Spencer Beef is the third largest beef packer in the United States. Ex. 66 at 53, 55; Ex. 74, Att. 39 (T. Pace)

IBP, Inc., who is not a party in this action, is the largest beef packer in the United States. Ex. 22 at 5 (Excel Corp. Annual Report, 1982–83); Ex. 18 at 4; Ex. 19 at 5. IBP is a subsidiary of Occidental Petroleum Corporation, a giant multinational corporation. During the year ending December 31, 1982, Occidental Petroleum reported combined sales of well into the billions of dollars, earnings into the hundreds of millions, and assets in the billions of dollars. (See sequestered Appendix A filed with the Clerk of the Court; See also Ex. 65 at Doc. I.D. No. 1507).

Monfort maintains that Excel's proposed acquisition of Spencer Beef would result in an anticompetitive effect on the relevant markets in the beef industry in which Monfort operates. Therefore, an analysis of Monfort's claim necessarily involves a determination of the relevant markets in the beef industry and an examination of the effects that the proposed acquisition would have within those markets.

The production and sale of beef and beef products is a multi-billion dollar industry. As currently comprised, all parties concede that the industry is competitive and that profit margins are low. Defendant Excel maintains that profit margins in the industry average between .5% and 1.5% as measured against sales. Monfort's profit margin for their fiscal year ending September 2, 1983 was .8% as measured against sales. T. Monfort.

The production process in the industry begins with the feeding or grazing of cattle. There are three basic categories of cattle: (1) fed steers and heifers ("fed cattle"); (2) nonfed steers and heifers; and (3) cows and bulls.

Fed cattle are steers and heifers which have been fattened in a commercial feedlot for a period of 100 to 140 days. Commercial feedlots may be independent or integrated with the operations of a beef packer

and these feedlots are generally located in areas with an abundant supply of feed grains. In addition, because of transportation costs, beef processing plants tend to be located in the proximity of commercial feedlots.

Fed cattle generally yield cuts graded USDA "good" or better. Nonfed cattle generally yield beef for grinding, by-products and cuts graded below USDA "good".

In 1983 the commercial cattle slaughter in the United States was broken down in the following way: grain fed steers and heifers—69%; nonfed steers and heifers—8%; and cows and bulls—22%.

Cattle are slaughtered at two types of plants, namely, plants which engage only in slaughtering cattle and plants which have facilities for both the slaughtering and fabrication of beef products. After slaughter, the carcass is either kept by the slaughterer for further processing or transferred whole to an independent fabricator.

At times the initial processing will be performed at a slaughter plant and then completed by an independent fabricator. "Fabrication" is the process whereby the carcass is broken down into either whole cuts (referred to as "primals", "subprimals" and "portions") or ground beef.

An "integrated firm" is a firm that both slaughters cattle and fabricates carcasses. An integrated firm generally conducts this operation in a single plant; however, in some instances, one plant may slaughter cattle and ship the carcasses a short distance to another commonly-owned plant for fabrication. Monfort, Excel and Spencer Beef, as well as the industry leader IBP, all possess integrated slaughter-fabrication plants.

A "breaker", another term for an independent fabricator, is a firm that fabricates carcasses but does not slaughter cattle.

A limited amount of fabrication also occurs in customer-owned fabrication plants. The bulk of this captive capacity is owned by Kroger, Winn-Dixie and several other California grocery and meat market chains.

Until recently, Safeway was also a major customer-fabricator.

The most reliable market share data suggests that beef processing is broken down approximately as follows: Fabrication by integrated slaughter-fabricators—60%; fabrication by independent fabricators—12%; and fabrication by customer-owned fabrication—12%. The balance of the fed steer and heifer slaughter (approximately 16%) is shipped in small lots and sold to local retailers as carcasses. The carcasses are broken down and processed into primal or subprimal cuts at the local retailer level.

The fabrication process generally yields three types of products: (1) primal, subprimal and portion cuts which are vacuum packed; (2) primal, subprimal and portion cuts which are not vacuum packed; and (3) ground beef. The term "boxed beef" refers to the process by which primal or subprimal beef cuts are fabricated, vacuum-packed and boxed for shipment to retailers or distributors. Under this process, the shelf life of the beef is significantly extended.

Boxed beef is a fairly recent innovation, however, it has gradually come to dominate the beef industry. The first important boxing technique began in the early to mid-1960's. Boxed beef now accounts for approximately 80% of all beef received at the retail supermarket level and at the hotel, restaurant and institutional ("HRI") level. Furthermore, the testimony at trial suggested that within the next two to three years, boxed beef will account for 85%–90% of all beef received at the retail supermarket level and the HRI level.

## III. STANDING—ANTITRUST INJURY

■ Section 7 of the Clayton Act prohibits the acquisition of the assets of one corporation by another where in any line of commerce

... the effect of such acquisition may be substantially to lessen competition or to tend to create a monopoly

15 U.S.C. § 18. Section 16 of the Clayton Act provides for injunctive relief against

threatened loss or damage by a violation of the antitrust laws, including Section 7 of the Clayton Act

> ... when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity under the rules governing such proceedings ...

15 U.S.C. § 26. It is within this statutory framework that the court must analyze plaintiff's standing to bring the action and to contest the matters in question. While any harm to the plaintiff is sufficient to meet the constitutional "injury in fact" requirement, *Associated General Contractors of California, Inc. v. California State Council of Carpenters, et al.*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action. Congress did not intend every person tangentially affected by an antitrust violation to maintain an action challenging that violation, *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982); *Illinois Brick v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977); Berger & Bernstein, *An Analytical Framework for Antitrust Standing*, 86 Yale L.J. 809 (1977). The phrase "antitrust standing" has traditionally been applied to label the elements of this inquiry.

From the outset, the defendants have maintained that the plaintiff lacked the antitrust standing necessary to contest the proposed acquisition. At the close of plaintiff's case in chief the defendants moved for involuntary dismissal pursuant to Rule 41(b) on the grounds that the plaintiff had failed to establish that it would suffer any injury actionable under the antitrust laws as a result of the proposed acquisition.

Defendants argue that the harm Monfort expects to suffer as the result of the planned acquisition stems from *increased* competition that will occur in the future, rather than from an injury *to* competition stemming from the sale. In essence, it is defendants' argument that Monfort's claimed injury will derive from heightened competition between IBP and Excel following Excel's acquisition of Spencer Beef's slaughtering and packing facilities.

Plaintiff disputes defendants' position on this issue arguing that the harm it will suffer, if the acquisition is allowed to go forward, will be the direct result of a sale of assets that violates Section 7 of the Clayton Act. That being the case, plaintiff contends that it has the requisite standing necessary to bring this action and has shown that it is threatened with loss or damages sufficient to invoke the court's equitable jurisdiction available under Section 16 of the Clayton Act, 15 U.S.C. § 26.

Plaintiff claims that if the planned acquisition is allowed to go forward it will suffer losses or be damaged by the market characteristics that will exist following the sale. Monfort asserts that after the acquisition the beef slaughtering and fabrication industry will be dominated by IBP and Excel. As noted IBP is presently the largest integrated beef slaughterer/fabricator in the nation. Excel is the second largest firm followed by the Spencer Beef division of Land O'Lakes, Inc. It is significant that the proposed sale would combine the second and third largest operations into one entity.

Following the planned sale, Monfort contends that Excel and IBP would attempt to enlarge their respective market shares as rapidly as possible at the expense of each other and, more significantly, at the expense of the smaller competitors such as Monfort. Plaintiff argues that to acquire increased market shares IBP and Excel would engage in a price-cost "squeeze" bidding up the price of the necessary raw product input supply (fed cattle) while at the same time lowering the cost of the finished output product (boxed beef).

As a result of this squeeze, which plaintiff contends would not occur absent the planned acquisition, the profit margins earned by market competitors will be severely narrowed. Plaintiff does not contend that predatory practices would be engaged in by Excel or IBP; nor does Mon-

fort assert that Excel and IBP would act in collusion with each other in an effort to drive others out of the market. Nevertheless, Monfort argues that the vast financial resources backing Excel, a wholly owned subsidiary of Cargill, and IBP, a subsidiary of Occidental Petroleum, will permit Excel and IBP to accept far lower profit margins while they endeavor to increase market share. In contrast to Excel and IBP, Monfort asserts that it lacks the financial reserves necessary to withstand or participate in this squeeze and remain a viable competitor.

After Excel and IBP succeed in driving out the smaller competitors and acquiring increased market shares, Monfort contends that IBP and Excel will lower the price paid for fed cattle and raise the price charged for boxed beef sold nationwide. Monfort further argues that other competitors will be driven from the market and, because of significant barriers to entry into the market, IBP and Excel will be essentially free to lower prices paid and raise prices charged without limitation. Cattle producers and feeders will suffer from lower prices paid to them and meat consumers will be required to pay higher prices for boxed beef.

The scenario described above is the harm or injury that plaintiff alleges it will suffer as a direct result of the acquisition which it contends violates Section 7 of the Clayton Act.

Defendants argue that the court need not reach the question of a possible violation of Section 7 because the plaintiff has not alleged an injury sufficient to give it standing to challenge the proposed sale. Defendants' position is that the harm that Monfort will allegedly suffer will result from an increase in competition or more vigorous competition between the remaining competitors. Therefore, defendants maintain that Monfort faces harm as a competitor rather than harm from an injury *to the competitive process.* Defendants argue that, in situations such as the one envisioned by Monfort, standing to prevent the acquisition has been rejected.

■ After careful consideration, it is our view that the plaintiff has established the requisite antitrust standing necessary to challenge the planned acquisition under Section 7 of the Clayton Act.

The notion of antitrust standing is not susceptible to a hard and fast rule that conveniently applies to all cases. As one commentator has noted "it is simply not possible to fashion an across-the-board and easily applied standing rule which can serve as a tool of decision in every case". Sherman, *Antitrust Standing: From Loeb to Malamud,* 51 N.Y.U.L.Rev. 374, 407 (1976).

Recently, however, the United States Supreme Court has attempted to identify certain factors to be considered in determining antitrust standing. *See, Associated General Contractors v. California State Council of Carpenters, et al., supra.* These factors include: (1) causal connection between the alleged violation and the harm; (2) the motive of the alleged violator; (3) the nature of the plaintiff's alleged injury; (4) the directness or indirectness of the alleged injury; (5) whether the injury is of the type Congress sought to redress by providing a private remedy for antitrust violations; (6) the existence of an identifiable class of persons whose self interest would motivate them to vindicate the public interest in antitrust enforcement; (7) whether denying a remedy would likely leave a significant antitrust violation undetected or unremedied; (8) the speculativeness of the damages claimed; (9) the interest in keeping the scope of complex antitrust trials within judicially manageable limits; and (10) the need to avoid the risk of duplicate recoveries.

While *Associated General Contractors* was a case involving a claim for treble damages under Section 4 of the Clayton Act, many of the factors mentioned are helpful in determining standing under Section 7 and Section 16 of the Clayton Act.

In the instant case the harm alleged by Monfort has a causal connection to the planned acquisition by Excel. Only after

Excel acquires the assets of Spencer Beef will it be in a position to engage in the cost-price squeeze in an effort to acquire increased market shares. Furthermore, unlike the situation in *Brunswick v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), the injury is directly related to the planned acquisition. Monfort would not be threatened if some other entity other than Excel or IBP acquired Spencer Beef's production facilities. It is only by virtue of the fact that Excel, as the second largest producer, is acquiring the assets of the third largest competitor, coupled with the geographical location of Spencer Beef's facilities, that the acquisition realistically threatens Monfort's position as a strong competitor in the marketplace.

Further, Monfort, as a direct competitor of Excel and IBP, is a member of one of the three identifiable groups who might reasonably challenge the planned acquisition. The three groups who can reasonably challenge a proposed acquisition are competitors, suppliers and consumers. In the instant case, the consumers of boxed beef and the sellers of fed cattle have no motivation, in the short term, to attack the planned sale because, at least initially, it would be a direct benefit to them. Only later when the complete impact of the acquisition is felt would these other groups have reason to complain. At that time the sale could not be prevented. As the Supreme Court noted in *Brunswick* a violation of the antitrust laws may initially result in a lower price or other actions favorable to groups who will ultimately suffer harm. *Brunswick, supra*, at 489 n. 14, 97 S.Ct. at 698 n. 14. To deny Monfort standing at this time might leave a significant antitrust violation unremedied without a single voice calling attention to the potential harm.

In some quarters the harm alleged by Monfort might be considered speculative. The testimony at trial and simple logic, however, add substance to Monfort's assertions and in our view are reflective of the dynamics in the industry in question. Monfort's allegations and proof of anticompeti-

tive effect are sufficient, given the nature of the violation alleged, the relief sought, the industry involved and the concentration of economic power vested in a limited number of slaughter fabricators. Section 7 prescribes mergers whose effect *"may be* substantially to lessen competition or *to tend* to create a monopoly."* (emphasis added). As the Supreme Court has stated on numerous occasions, Section 7

> ... is ... a prophylactic measure intended primarily to arrest *apprehended* consequences of inter-corporate relationships *before* those relationships work their evil.

*Brunswick, supra,* at 485, 97 S.Ct. at 695 (emphasis added).

■ It is uniformly agreed that in an antitrust action seeking only injunctive relief, the question of standing becomes less of an issue. *Board of Regents of University of Oklahoma v. N.C.A.A.*, 707 F.2d 1147, 1151 (10th Cir.1983), *cert. granted,* ── U.S. ──, 104 S.Ct. 272, 78 L.Ed.2d 253 (1983); *Jeffrey v. Southwest Bell*, 518 F.2d 1129, 1132 (5th Cir.1975); *In Re Multidistrict Vehicle Air Pollution* MDL No. 31, 481 F.2d 122 (9th Cir.1973); Von Kalinowski, Antitrust Laws and Trade Regulation, Vol. 10 § 114.01 *et seq.*, vol. 3 § 11.15 (1983); Areeda, *Antitrust Analysis* 56 (3rd Ed.1981). Concerns about duplicate treble damages awards or the need to make complex damages apportionment calculations are not present in an action seeking injunctive relief under Section 7. Because the threat of treble damages does not exist, the court may consider more freely other purposes behind giving private litigants an injunctive remedy to prevent or end antitrust violations. As the Supreme Court noted in *Zenith Corp. v. Hazeltime*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1968), Section 16 of the Clayton Act should be construed and applied to serve the purpose of enforcing the antitrust laws and not only to provide private relief. The availability of injunctive relief under Section 16 "should be conditioned by the necessities of the public interest which congress sought to

protect." *Zenith Corp., supra,* at 131, 89 S.Ct. at 1580.

■ The defendants have argued from the outset of this case that the plaintiff has not alleged an injury cognizable under the federal antitrust laws. Stated another way, the defendants contend that Monfort has not alleged an "antitrust injury". An antitrust injury is an injury

> of the type that the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation *or* of anticompetitive acts made possible by the violation. It should in short be the type of loss that the claimed violations would be likely to cause.

*Brunswick, supra,* at 489, 97 S.Ct. at 697. While in *Brunswick* the Supreme Court was defining the type of injury for which treble damages may ultimately be recovered, the court has also made it plain that the type of injury alleged is a factor in determining antitrust standing. *Associated General Contractors, supra.* In other words, as a threshold determination, a court must ask whether the type of harm or injury alleged is the type that the claimed violation would be likely to cause.

The plaintiff has alleged that it will be harmed or injured by the market characteristics that will exist following Excel's planned acquisition. It is plaintiff's allegation that the purchase of Spencer Beef's assets will permit Excel to engage in a price-cost squeeze in an effort to acquire a greater market share. It is realistic to believe that both IBP and Excel will be seeking a greater market share by raising the price paid for raw products and lowering the cost of their finished product. Because IBP and Excel will likely match any move by the other, any increase in market share would be at the expense of Monfort and others.

The injury alleged by the plaintiff, as described above, is not a cognizable antitrust injury according to the defendants. Defendants argue that plaintiff's injury results from more vigorous competition and

not from any anticompetitive affects arising from the acquisition. Defendants rely heavily on the decision in *Brunswick, supra,* in support of their position.

We note that there are two crucial differences between *Brunswick* and the instant case. First, *Brunswick* involved an action for treble damages under Section 4 of the Clayton Act. Second, it was shown by the Court in *Brunswick* that the plaintiff might well suffer the identical injury without any antitrust violation. In contrast, Monfort requests injunctive relief and at least suggests that the potential injury would take place only if either IBP or Excel acquired the assets of Spencer Beef.

Of more importance, however, is our view that the harm or injury alleged by Monfort is of the type that is likely to be caused by the alleged violation. Further, we believe the injury to Monfort is of the type that the antitrust laws were intended to prevent.

The purpose of Section 7 is to preclude acquisitions that may substantially lessen competition or tend to create a monopoly. Defendants argue that the acquisition of Spencer Beef's assets will increase competition rather than decrease it. According to that argument, even an acquisition that would foster collusion or predatory pricing would not violate Section 7 because competition would be greater and more vigorous. The argument is not persuasive and is rejected.

■ The court also rejects the defendants' contention that, unless predatory pricing or collusive activity is imminent, there can be no Section 7 violation and no antitrust injury to plaintiff. Clearly that is not the showing that must be made under Section 7. Under Defendants' interpretation Section 7 would be unnecessary because the antitrust laws already prohibit that type of conduct and permit it to be enjoined where it is occurring or where it is imminent. *See,* 15 U.S.C. § 1; 15 U.S.C. § 26.

■ Section 7 was designed to prevent the acquisition of one corporate entity by another where the effect of the acquisition

*may be* to substantially lessen competition or to *tend* to create a monopoly. The section is intended to prevent those acquisitions which set the stage for lessened competition or create the climate or atmosphere for monopolistic behavior. The party seeking *injunctive relief* need not show that a violation of another antitrust statute is imminent.

Given the purpose of Section 7 plaintiff has alleged an antitrust injury sufficient to support a finding of antitrust standing. The plaintiff alleges that the acquisition may substantially lessen competition and that its competitive position will be directly harmed as a direct result of the acquisition. Further, plaintiff's position is that if the acquisition does not take place *or* if someone other than a market leader acquires Spencer Beef, Monfort would not be harmed.

Were we to accept defendant's argument, *no* private individual could contest the planned acquisition. Competitors would be barred because any injury to them would not stem from collusion or predation. Taking defendants' position to its logical conclusion, consumers and cattle feeders could not seek injunctive relief both because they would not be presently harmed and because any alleged harm in the future would be mere ephemeral possibilities, too speculative to seek relief under Section 7.

The courts have specifically recognized that Section 7 may be violated by actions that, absent Section 7, would not constitute violations of other antitrust laws. *FTC v. Procter & Gamble*, 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1966). As the court stated in *Procter & Gamble*

> If enforcement of Section 7 turned on the existence of actual anticompetitive practices the congressional policy of thwarting such practices in their incipiency would be thwarted.

*procter & Gamble Co., supra* at 577, 87 S.Ct. at 1229.

The position of the defendant, if accepted, would eliminate private enforcement of Section 7. However, Congress did not intend that only the federal government could challenge such an acquisition.

> [T]he purpose of giving private parties treble damage and injunctive remedies was not merely to provide private relief but was to serve as well the high purpose of enforcing the antitrust laws.

*Zenith Corp. supra*, 395 U.S. at 130–31, 89 S.Ct. at 1580.

In sum we are of the view that, given the factors mentioned by the Supreme Court in *Associated General Contractors, supra,* the plaintiff has established sufficient antitrust standing to bring an action for injunctive relief under Sections 7 and 16 of the Clayton Act. To the extent that antitrust injury is a key factor, the plaintiff has alleged sufficient facts to satisfy this requirement as a part of the standing inquiry.

## IV. JUSTICE DEPARTMENT MERGER GUIDELINES

The defendants contend that this court should give careful consideration to the analysis of the facts of this case under the merger guidelines developed by the Department of Justice. 47 Fed.Reg. 28,493 (1982). First promulgated in 1968, the guidelines were substantially redrafted by the Department and re-released in June of 1982.

 Department of Justice Merger Guidelines are not binding on this court in our determination of the impact that defendants' acquisition will have on competition. The guidelines are primarily a statement of the Justice Department's own enforcement intentions and serve as a tool to assist Justice Department attorneys in determining which mergers to challenge. They do not represent legal precedent to determine illegality. Indeed the Justice Department is not necessarily bound by their own guidelines in their handling of litigation under Section 7 of the Clayton Act. U.S. Department of Justice Merger Guidelines. § I, 47 Fed.Reg. 28,493 and 28,494 (1982).

We have considered the Merger Guidelines in the process of resolving this case.

However, in determining whether the planned acquisition will violate Section 7 of the Clayton Act, the Court has relied primarily on the judicial standards developed in judicial precedents arising under Section 7.

## V. RELEVANT MARKETS

■ Before considering whether a proposed acquisition will have a proscribed effect on competition, it is necessary to define the market with respect to which the competition may be said to exist:

> [d]etermination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act because the threatened monopoly must be one which will substantially lessen competition within the area of effective competition. Substantiality can be determined only in terms of the market affected.

*Brown Shoe Co. v. United States,* 370 U.S. 294, 324, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962), quoting from *United States v. E.I. du Pont de Nemours & Co.,* 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957).

In the instant case, plaintiff maintains that the proposed acquisition will have potential anticompetitive effects in two different markets: (1) the regional market for the procurement of fed cattle (the "input" market); and (2) the national market for the sale of packer boxed beef (the "output" market).

At trial, knowledgeable and respected experts rendered opinions that led to contrary interpretations regarding the scope of the relevant product and geographic markets in the input and output markets. We have endeavored to determine those opinions which represent the more probable state of events and the relative weight to be given each. In general, however, the court found the experts who were called by Monfort to be particularly persuasive in that they emphasized the actual conditions in the marketplace as well as the theoretical implications of the proposed acquisition.

## A. THE INPUT MARKET

■ The "relevant market" concept entails two separate dimensions: (1) the product market or "line of commerce"; and (2) the geographical market or "section of the country." *Indiana Farmer's Guide Pub. Co. v. Prairie Farmer Pub. Co.,* 293 U.S. 268, 279, 55 S.Ct. 182, 185, 79 L.Ed. 356 (1934); *United States v. M.P.M., Inc.,* 397 F.Supp. 78 (D.Colo.1975). The product market is normally considered first because the geographic market typically depends on the nature of the product involved. *See, e.g. United States v. Pabst Brewing Co.,* 384 U.S. 546, 555–556, 86 S.Ct. 1665, 1670–1671, 16 L.Ed.2d 765 (Harlan, J., Concurring).

### 1. Product Market

Plaintiff maintains that the relevant product in the input market is grain fed steers and heifers ("fed cattle"). Plaintiff contends that fed cattle should be considered a separate product market because grain fed steers and heifers are the only cattle which will produce beef with a consistent quality of U.S.D.A. "good" or above. In addition, plaintiff alleges that the product market should not include the facilities of slaughterers of nonfed cattle for the following reasons: (1) slaughterers of fed cattle and non-fed cattle are generally in different parts of the country; (2) cow and bull slaughtering facilities lack important economies of scale because they are smaller than the facilities used to slaughter fed cattle; (3) such facilities lack fed cattle fabrication facilities, and it is not economically feasible to ship carcasses; (4) customers who purchase fed cattle are generally unwilling to buy from slaughterers who deal to any great extent in non-fed cattle; and (5) defendants' internal reports indicate their belief that fed cattle constitute a separate product market.

Defendants suggest that the relevant product in the input market should include all cattle slaughtered because nonfed steers and heifers and cows and bulls are substitutes for fed cattle. Defendants also contend that, from the perspective of a

seller of fed cattle, any purchaser able and willing to purchase fed cattle is a perfect substitute for present fed cattle purchasers. Therefore, defendants believe that the product market should be expanded to account for the capacities of the following groups which defendants assert would purchase fed cattle if prices decline below competitive levels: (1) large scale fed cattle sellers who would integrate forward into slaughtering, and perhaps, fabrication; (2) firms that currently purchase cows and bulls as well as fed cattle, which would increase purchases of fed cattle; and (3) plants that currently slaughter only cows and bulls which would convert to fed cattle slaughter.

In determining whether products are within the same relevant product market, it is important to consider the functional and reasonable interchangeability of the products, *See, United States v. E.I. du Pont de Nemours & Co., supra; Kaiser Aluminum & Chemical Corp. v. F.T.C.,* 652 F.2d 1324 (7th Cir.1981); *United States v. Charles Pfizer & Co.,* 246 F.Supp. 464, 468 (E.D.N.Y.1965); the cross-elasticity of demand for the products, *See, Brown Shoe Co. v. United States, supra; United States v. E.I. du Pont de Nemours & Co., supra;* and the interchangeability of the products' production facilities, *See, Kaiser Aluminum & Chemical Corp., supra; Equifax, Inc. v. F.T.C.,* 618 F.2d 63 (9th Cir.1980).

Comparing the evidence presented at trial to the case law cited above, the Court finds that fed cattle constitute the relevant product within the input market.

We reject defendants' argument that nonfed cattle and cows and bulls are viable substitutes for fed cattle. To classify products in the same market, it is essential that they be both functionally and reasonably interchangeable. In today's market, under the evidence, we are persuaded that nonfed cattle and cows and bulls are not functionally interchangeable with fed cattle. The evidence presented at trial demonstrated that grain fed steers and heifers are the only cattle which yield beef cuts with a

consistent quality of USDA "good" or better. Ex. 74 (Pace Testimony), Att. 3 at 1–2. Furthermore, plaintiff's witnesses testified that cows and bulls and nonfed steers and heifers will not substitute for fed cattle. Strealer, T. 20. This fact is best illustrated by the overwhelming percentage of fed cattle compared to nonfed cattle or cows and bulls, which are slaughtered and fabricated by the parties themselves. The slaughter of cows and bulls accounted for less than 1% of Excel's total slaughter in 1982. Ex. 74 (Pace Testimony), Att. 4. In fact, cow and bull slaughter represented only 0.3% of the 1982 slaughter by major packers, including Excel, IBP, Spencer and Monfort. *Id.*

Defendants further maintain that the input product market should be expanded to include all cattle slaughtered because of the claimed interchangeability of the slaughter facilities for nonfed and fed cattle. The court rejects this attempt to expand the product market in this case.

The degree to which a manufacturer may employ existing facilities to produce different products is a relevant factor in defining a broad product market under Section 7 of the Clayton Act. *See, e.g., Kaiser Aluminum & Chemical Corp., supra; Equifax, Inc. v. F.T.C., supra.* However, it is necessary in making such an analysis to adopt a realistic view of the market. In order to justify expanding a relevant product market due to interchangeability of production facilities, it is necessary to focus on what manufacturers *actually* do as opposed to what they *could* do. Whatever modifications would be required to change to a different type of production must be feasible from the point of view of design and cost. *See, Memorex Corp. v. I.B.M.,* 458 F.Supp. 423, 429 (C.D. Cal.1978), *aff'd.,* 636 F.2d 1188 (9th Cir. 1980), *cert. denied,* 452 U.S. 972, 101 S.Ct. 3126, 69 L.Ed.2d 983 (1981); *In re IBM Peripheral EDP Devices Antitrust Litigation,* 481 F.Supp. 965, 985 (N.D.Cal.1979), *aff'd.,* 698 F.2d 1377 (9th Cir.1983).

In the instant case, the court finds that the existence of nonfed cattle slaughtering plants is not a significant competitive check on fed cattle slaughterers' pricing activities. An exhibit from Excel's files supports the conclusion that it would not be cost effective for a slaughterer of nonfed cattle to switch in whole or in part to slaughtering fed cattle:

> Combining cow slaughter/processing with fed beef slaughter/processing has not proven to be an efficient operation. During the cow liquidation of 1976/1977 we combined a cow slaughter with a fed beef slaughter in our Rock Port plant. The results of this experience were unfavorable.

Ex. 29 at 2 (Memorandum from Bill Nicholson to M.D. McVay, et al.)

This inefficiency apparently stems at least in part from the fact that cow and bull slaughter plants tend to be smaller than fed cattle slaughter plants. *Id;* T. Stout. Due to their smaller size, nonfed cattle slaughtering plants lack some of the economies of scale that exist in fed cattle plants. The importance of such economies of scale are of added significance in this case because of the relatively low profit margin in the beef industry. Therefore, the relative lack of such economies of scale would place companies utilizing nonfed cattle slaughter facilities at a comparative disadvantage in the slaughter of fed cattle.

In addition, nonfed cattle slaughter facilities generally lack fabrication facilities. Therefore, most of the nonfed cattle slaughtering firms which might consider switching to fed cattle slaughter would have to add fabrication facilities or market their output by shipping carcasses. As will be discussed below, transporting carcass beef is uneconomical compared to transporting boxed beef, and boxed beef and carcass beef should not be included within the same relevant product market. Furthermore, the lack of integrated facilities would result in such a firm being unable to derive the benefit enjoyed by integrated firms with respect to the efficient use of byproducts. Ex. 30 at 1 (Changes in the Beef Packing Industry, Notes for Caprock Annual Meeting, June 24, 1983).

Finally, Mr. Monfort testified that customers who typically purchase beef graded USDA "good" or better (typically boxed beef), prefer not to buy from firms that engage in a substantial volume of cow and bull slaughtering.

For reasons stated above, the court finds that firms currently slaughtering nonfed cattle would not significantly increase their purchases of fed cattle or switch to the slaughter of fed cattle in response to a decline in the price of fed cattle. In addition, the court finds no substantial evidence to indicate that large scale fed cattle sellers would to any great extent integrate into the slaughter and fabrication of fed cattle in response to a decline in the price of fed cattle. Any resulting increase in purchases of fed cattle would not provide a competitive check on the current purchasers of fed cattle. In light of these findings, the court is of the opinion that the input product market should not be expanded to include all potential purchasers of fed cattle. Accordingly, the court concludes that the procurement of fed cattle is the relevant product within the input market. This is the legitimate and common-sense market upon which we will evaluate the effects of the proposed acquisition.

### 2. Geographic Market

The relevant geographic market for the procurement of fed cattle is an additional issue.

Plaintiff maintains that this aspect of the input market is regional in scope. According to plaintiff, the regional procurement market includes all or parts of the following twelve states: Nebraska, South Dakota, Southern Minnesota, Wisconsin, Iowa, Illinois, Missouri, Kansas, Eastern Colorado, and the panhandle region of Texas, Oklahoma and New Mexico.

Conversely, defendants assert that the procurement market should include the entire United States or at the very least the United States east of the Rocky Mountains. Defendants argue that any attempt to de-

press prices below competitive levels would result in the diversion of fed cattle sales to areas outside of the twelve state area suggested by plaintiff.

■ The relevant geographic market in a case under Section 7 of the Clayton Act is the area in which the seller competes and in which buyers can practicably turn for supply. *United States v. Connecticut National Bank*, 418 U.S. 656, 94 S.Ct. 2788, 41 L.Ed.2d 1016 (1974); *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 331–332, 81 S.Ct. 623, 630, 5 L.Ed.2d 580 (1961). Case law indicates that when analyzing the relevant geographic market in a case such as this, it is necessary to determine "where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate." *See, United States v. Philadelphia National Bank*, 374 U.S. 321, 357, 83 S.Ct. 1715, 1738, 10 L.Ed.2d 915 (1963); *F & M Schaefer Corp. v. Schmidt & Sons, Inc.*, 597 F.2d 814, 817 (2nd Cir.1979); *United States v. M.P.M., supra.*

■ In conducting the analysis, it is critical to focus on the commercial realities of a particular market. *See, United States v. M.P.M., supra; United States v. Phillipsburg National Bank & Trust Co.*, 399 U.S. 350, 90 S.Ct. 2035, 26 L.Ed.2d 658 (1970). In particular, courts have considered the following economic factors in determining the geographic scope of relevant markets: (1) transportation costs, *see, e.g., FTC v. Procter & Gamble Co.*, 386 U.S. 568, 571, 87 S.Ct. 1224, 1226, 18 L.Ed.2d 303 (1967); *United States v. M.P.M., supra;* (2) the localized nature of demand, *see, e.g., United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974), *United States v. First National Bancorporation, Inc.*, 329 F.Supp. 1003, 1012–1014 (D.Colo. 1971), aff'd per curiam by an equally divided court, 410 U.S. 577, 93 S.Ct. 1434, 35 L.Ed.2d 507 (1973); and (3) industry recognition of a particular geographic area as a distinct market. *See e.g., United States v. Phillipsburg Nat'l Bank & Trust Co., supra; F & M Schaefer Corp. v. C. Schmidt*

*& Sons, Inc., supra.* Two common sources of industry recognition are the statements and perceptions of the merging firms and other industry members. *See, e.g., F & M Schaefer Corp. v. C. Schmidt & Sons, Inc., supra* at 816–817; *United States v. Kimberly-Clark Corp.*, 264 F.Supp. 439, 455 (N.D.Cal.1967). Furthermore, within a broad geographic market, an economically significant submarket may also exist. *United States v. Marine Bancorporation, supra.*

■ Comparing the evidence presented at trial against the backdrop of persuasive case law, the court finds that the relevant geographic area for the procurement of fed cattle is the twelve state regional market described by the plaintiff. This twelve state market is the meat producing center of the country as it relates to fed cattle.

Although the demand for beef may be national in scope, the evidence at trial indicated that the procurement of fed cattle is relatively localized in nature. Nearly all fed cattle are purchased less than 200 miles from the slaughter plant. Ex. 61 at 80 (Fed Cattle Procurement and Pricing, and Beef Packer Competition—An Empirical Study, C. Ward, December 1981); Knobbe, T. 27, Webber, T. 34–35. In fact, the evidence at trial suggested that most fed cattle are purchased from feedlots within 100 miles of the slaughter plant. Ex. 74 (Pace Testimony), Att. 25 (USDAS Report on concentration in the Meat Packing Industry—National Procurement Levels, Sept. 24, 1979 and April 29, 1980, App. 22).

As noted above, statements and perceptions of the merging firms are common sources of industry recognition of a relevant geographic market. In the instant case, defendant Excel's own statements and perceptions confirm the localized nature of the procurement market. For example, an internal memorandum of Excel describes its "normal buying area" as the area within 150 miles of its packing plants. Ex. 27 at 1 (MBPXL memorandum from B. Nicholson to R.W. Watson, Oct. 26, 1982). Furthermore, a "procurement area" map contained in an Excel publication indicates

that Excel's primary purchasing area is a geographic region comparable to the twelve state region suggested by plaintiffs. Ex. 33B at Doc. I.D. No. 4018 (Excel: America's Beef Company).

Defendants contend that the procurement market should be national in scope because it is dependent on the nationwide demand for beef. Defendants reason that since the demand for fed cattle and hence their price, is derived from the demand for beef, it follows that the price of fed cattle is determined in a nationwide market. Defendants contend that this argument for a nationwide procurement market is supported by the high degree of uniformity and interdependence in the movement of fed cattle prices throughout the continental United States.

The court recognizes that evidence of nationwide pricing interdependence is some evidence in support of a nationwide market. In the same way, localized demand and the existence of regional price differentials support the conclusion that a market is regional in scope.

Conflicting evidence was presented at trial regarding the existence of price interdependence and regional price differentials. The court, however, is persuaded as to the existence of such differentials by defendant Excel's own statements regarding its motivation for acquiring the Spencer assets. In several internal memoranda, Excel or Cargill representatives suggested that a primary reason for the attempt to acquire Spencer Beef was the desire to take advantage of differences in fed cattle prices found in a regional market defined as the western cornbelt (eastern Nebraska, western Iowa and southwestern Minnesota). Ex. 5 at Doc. I.D. Nos. 554–56 (Cargill memo from M.D. McVay to W. Watson, et al., Dec. 10, 1982); Ex. 4 at Doc. I.D. 321–322 (Excel memo from W. Watson to Finance Comm., May 25, 1983). These statements by the defendants strengthen the conclusion that regional price differentials exist in the procurement market, and that the relevant procurement market in this case is regional in scope.

Defendants also contend that the regional procurement market would expand significantly in response to an effort by current purchasers to depress the price of fed cattle. The court, however, finds that the procurement market would not significantly expand in such a situation because of the high transportation costs in the beef industry. The evidence at trial indicated that transportation costs and shrinkage costs place substantial limitation on the procurement market. Roberts, T. 12, 20, 26; Webber, T. 31–32, 38; Knobbe, T. 28–29, 50–51. In addition, although the court recognizes that transportation and shrinkage costs are not as great per mile after the first 150–200 miles, the court is persuaded by Mr. Monfort's testimony that such costs are still high in proportion to the relatively small profit margins in this industry. Accordingly, the court finds that transportation costs are a major factor which realistically confine the procurement market to the twelve state area outlined by plaintiff.

In addition to the limits imposed by transportation costs, the court notes that the scope of the procurement market is also limited by the relative lack of facilities for the slaughter and fabrication of fed cattle outside of this twelve state region. Although the evidence showed that there is some slaughter capacity for fed cattle outside of the twelve state region, that capacity is limited. Ex. 26 (Excel memo regarding slaughter and fabrication capacities of United States plants, April 15, 1983). As noted above, the twelve state region accounts for 74% of all fed cattle marketed in the United States. Ex. 60 at 10 (Geographic Market and Prices for Fed Steers and Heifers, USDA P & S Report, April 1982). Accordingly, if the price of fed cattle within the twelve state region was artificially depressed, the limited capacity outside of the region does not appear to represent a viable alternative for purchasing, slaughtering and fabricating the cattle fed within the region.

In several documents, Excel representatives suggested that the general area referred to as the twelve state region is a

distinct procurement market. Ex. 4 at Doc. I.D. No. 321 (Support for Acquisition of Spencer Beef Plants, Excel memo from W. Watson to Finance Comm., May 25, 1983); Ex. 19 at 7 (MBPXL Annual report, 1981–82); Ex. 74 (Pace Testimony), Att. 28 (Documents Showing Excel's View of Procurement Areas); Ex. 70 at 4–5 (MBPXL LRPC Report, Jan. 25, 1982). These documents lend further support to the conclusion that the twelve state region represents a distinct regional market for the procurement of fed cattle.

In sum, the court concludes that the relevant product in the input market consists only of fed steers and heifers. In addition, the relevant geographic scope of the procurement market is the twelve state region outlined by the plaintiff.

## B. OUTPUT MARKET

The proposed acquisition must also be analyzed in terms of its effect on a second relevant market on the "output" side of the beef packing industry.

Monfort maintains that the relevant output market is the national market for boxed beef produced both by integrated packers and independent fabricators. Within that market, Monfort contends that there exists a product submarket consisting only of packer boxed beef.

Defendants maintain that the relevant product market on the sales side encompasses all beef, including ground beef, packer boxed beef, boxed beef produced by independent fabricators, non-vacuum packed beef, and carcass beef. In addition, defendants maintain that the product market should be expanded to include the following groups which allegedly would increase their sales of boxed beef if boxed beef prices were raised above competitive levels: (1) current boxed beef producers who could increase their production of boxed beef; (2) fabricators who currently vacuum pack none or only a portion of their output and could increase their proportion of vacuum packed cuts; (3) firms which fabricate cows, bulls and nonfed cattle which could turn to or increase their

fabrication of fed cattle; and (4) large retailers which could commence or increase their own fabrication operations.

The parties agree that the geographic market on the sales side is the entire United States. Defendants, however, contend that the relevant output market should also include all beef imported into the United States.

### 1. Product Market

In determining whether items are within the same relevant product market, as noted above, it is important to consider the functional and reasonable interchangeability of the products, the cross-elasticity of demand for the products, and the interchangeability of the products' production facilities.

■ Furthermore, the existence of a broad product market does not negate the existence of an economically significant submarket. *See United States v. Continental Can Co.*, 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964); *United States v. Aluminum Co. of America*, 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964); *Brown Shoe Co. v. United States, supra.* The Supreme Court has suggested several criteria against which the facts of a particular case may be measured:

> [1] industry or public recognition of the submarket as a separate economic entity, [2] the product's peculiar characteristics and uses, [3] unique production facilities, [4] distinct customers, [5] distinct prices [6] sensitivity to price changes, and [7] specialized vendors.

*Brown Shoe, supra,* 370 U.S. at 325, 82 S.Ct. at 1524 (citation and footnote omitted) (bracketed numbers added). It is not necessary for a plaintiff to demonstrate the existence of all seven of the factors enumerated in *Brown Shoe* in order to demonstrate the existence of an economically significant submarket. *See, United States v. M.P.M., supra.*

■ Although there are various beef products which might be placed within the same broad product market (i.e. all beef), we find that boxed beef constitutes an eco-

nomically significant product submarket within the beef industry.

Initially, the court notes that the evidence at trial suggested that there is strong industry recognition of boxed beef as an economically significant product submarket. In particular, defendants' own documents indicated recognition of boxed beef as a separate submarket. Excel has referred to its "basic business of buying fed cattle and selling boxed meat," and it has compared its performance to IBP's in "the boxed beef market in the United States." Ex. 16 at 2 (MBPXL Annual Report, Jan. 1981); Ex. 14 at 5 (MBPXL Annual Report, 1980–81); Ex. 19 at 5 (MBPXL Annual Report, 1981–82).

Furthermore, the court finds that ground beef should not be included in the same submarket as boxed beef. Although ground beef and boxed beef are, in one sense, interchangeable as food stuffs, the two products are not functionally interchangeable in several important respects. The testimony at trial indicated that there are many uses, particularly in the HRI sector, for which the better cuts of beef (i.e. boxed beef) is the only suitable product. Strealer, T. 31. In addition, the testimony at trial demonstrated that boxed beef and ground beef are the products of substantially different production facilities. Finally, although the court heard conflicting testimony regarding the relationship between the prices of boxed beef and ground beef, it is indisputable that substantial price differentials exist between ground beef and the better cuts of boxed beef. Ex. 74 at 17 (Pace Testimony) and Att. 20 ("Hamburger and Beef Consumption and Prices, 1971–1981", *Meatfacts* at 17, 1982 Ed.). The existence of such price differentials is additional evidence supporting the conclusion that the two products do not belong in the same relevant market. *See, Reynolds Metals Co. v. F.T.C.*, 309 F.2d 223, 229 (D.C.Cir.1962).

Therefore, utilizing in part *Brown Shoe* criteria, we can only conclude that boxed beef and ground beef should not be included in the same product submarket.

We have also considered and reject defendants' contention that carcass beef and boxed beef should be included within the same product submarket. We recognize that the ultimate consumer is probably unable to distinguish between carcass beef and boxed beef. We find, however, that boxed beef and carcass beef are not functionally interchangeable to the retail store owners and HRI buyers who are the primary purchasers of such products. The evidence at trial indicated that the attributes of boxed beef, such as reduced transportation costs, reduced labor costs, and longer shelf life, contribute to the general superiority of boxed beef over carcass beef. This evidence also supports the conclusion that boxed beef and carcass beef do not belong in the same relevant product market. For example, Excel has estimated that the direct cost per pound to the retailer may be reduced by 8.3% when boxed beef is utilized rather than carcass beef. Ex. 33A at 19–22 (Boxed Beef—The Economic Advantages). This figure is particularly significant in light of the evidence cited above regarding the relatively low profit margins in the beef industry. Furthermore, although Excel maintains that their estimate regarding the costs savings associated with boxed beef is a best case analysis used in advertising, the relative advantages of boxed beef over carcass beef are reflected in the growing dominance of boxed beef in the beef industry. The evidence at trial indicated that carcass beef sales currently account for only 16% of fed steer and cattle slaughter. Moreover, the market share of boxed beef has risen from zero to 80% in the past 20 years, and it appears that this trend will continue in the future. Ex. 24 at 7–8 (Excel LRCPC Report, Jan. 24, 1983); Ex. 70 at 3 (MBPXL LRCP Report, Jan. 25, 1982); Ex. 25 at 3 (Excel LRCR Report, April 25, 1983). An exhibit from Excel's files concludes: "As we have stated before, it is not a matter of if, but a matter of when the processor puts all or just about all of the cattle in a box." Ex. 12 at 4 (LRPC Meeting, Jan. 21, 1980). Finally, the court notes that Excel documents suggest that Excel, prior to this

lawsuit, considered boxed beef and carcass beef to be separate products within separate markets. Ex. 13 at 4 (MBPXL LRPC Report, April 21, 1980); Ex. 29 at 1 (Excel memo from B. Nicholson to M.D. McVay, et. al., Dec. 31, 1982). It is our view and we so find that carcass beef and boxed beef should not be included within the same relevant product market.

For similar reasons, the court finds that the relevant product market should not include beef fabricated at captive fabrication facilities owned by retail supermarket chains. Such facilities inherit the inefficiencies associated with carcass beef because, by definition, they break carcasses that have been transported by a slaughterer. These inefficiencies, according to evidence at trial, have resulted in a continuing decline in the market share of such facilities as retail stores discontinue their fabrication operations. Ex. 13 at 4 (MBPXL LRPC Report, April 21, 1980); Ex. 16 at 5 (MBPXL LRPC Report, January 1981); Ex. 25 at 3 (Excel LRPC Report, April 25, 1983; Ex. 70 at 3 (MBPXL LRPC Report, Jan. 25, 1982). Furthermore, the testimony at trial indicated that captive fabrication facilities, as a result of their size and nature, use different production procedures and have different types of production facilities than are found in integrated plants or independent fabrication plants. T. Monfort. We note that this limited product line is not available to many of the current purchasers of boxed beef produced at integrated facilities and independent fabrication plants. Captive fabrication facilities owned by retail supermarket chains sell their product directly to ultimate consumers through those chains; accordingly, these facilities apparently do not sell a significant portion of their product to the HRI segment of the market.

Thus, beef fabricated by captive fabrication facilities owned by retail supermarket chains should not be included in the market for the sale of boxed beef produced by integrated plants and independent fabricators. In addition, the court finds that this source of beef does not provide a competitive check on the relevant product market.

An additional finding is that the relevant product market includes all boxed beef produced by independent fabricators as well as boxed beef produced from integrated facilities.

As noted above, the plaintiff has the burden of establishing the relevant product market in an action under Section 7 of the Clayton Act. In the instant case, the plaintiff failed to demonstrate that boxed beef from independent fabricators should not be included in the relevant product market. The court recognizes that independent fabricators may incur relatively higher transportation costs than do integrated beef producers. Ex. 13 at 7 (MBPXL LRPC Report, April 21, 1980). The court also acknowledges that independent fabricators may, to some extent, lack certain economies of scale possessed by integrated firms. Ex. 26 (MBPXL memo listing slaughter and fabrication capacity of plants in the United States.) Furthermore, the court recognizes that the existence of product codes, such as the product code associated with packer boxed beef, is some evidence of that product being a part of an economically significant submarket. *See, M.P.M. v. United States, supra.* However, the court finds that the boxed beef produced by independent fabricators is functionally interchangeable with boxed beef produced at integrated facilities. In addition, the plaintiff was unable to quantify any substantial difference in the prices of the two "types" of boxed beef. Finally, these two types of boxed beef are sold to comparable customers by comparable vendors. Accordingly, the court finds that the relevant product market on the sales side should include boxed beef produced by independent fabricators.

Therefore, the court finds that boxed beef constitutes an economically significant submarket in the beef industry. The court includes within the relevant product market all boxed beef produced by independent fabricators and at integrated slaughter-fabrication facilities.

▋ Defendants maintain that the relevant product market should be expanded to account for firms which would increase their production of boxed beef in response to an increase in the price of boxed beef.

As noted before, the degree to which a manufacturer may employ existing facilities to produce different products or expand production of a particular product is a relevant factor in defining a product market under Section 7 of the Clayton Act. However, as outlined above, it is necessary in making such an analysis to adopt a realistic view of the market and focus on how manufacturers actually would react in a situation as well as how they could react.

The court considered and rejects defendants' contention that the product market should be expanded to account for a potential increase in the fabrication of boxed beef by firms which currently fabricate nonfed cattle and cows and bulls. As observed before, plants which slaughter and fabricate nonfed cattle and cows and bulls generally lack the size and economies of scale that are found in plants which currently slaughter and fabricate boxed beef. In addition, the testimony at trial indicated that purchasers (particularly in the HRI market) are generally unwilling to purchase boxed beef from plants which also deal, to any great extent, in nonfed cattle and cows and bulls. Accordingly, the court finds that the limited amount of boxed beef which might be produced by such firms in response to a change in boxed beef prices would not significantly affect or expand the relevant product market.

Furthermore, the court finds that the product market would not be significantly expanded by increased production by fabricators who currently vacuum pack none or only a portion of their product. The amount of beef currently produced by these fabricators is not clear nor do we have any indication as to what extent such fabricators might increase their production of boxed beef in response to an increase in the price of boxed beef. In this regard, Mr. Monfort testified that he was unaware of any firms that currently fabricate beef but fail to vacuum pack their product. Accordingly, the court finds that the product market should not be expanded to account for the reactions that these firms might have in the face of an increase in the price of boxed beef.

▋ The court, however, accepts the defendants' contention that the relevant product market should reflect the capacity of current producers of boxed beef to increase their production in response to an increase in the price of boxed beef. To the extent that these producers could and would increase their production, that production should be included in the relevant market. Therefore, in analyzing the affect of the proposed acquisition, the court will note the current capacity of the various firms that fabricate boxed beef. However, to the extent that the defendants maintain that the court should include a firm's ability to increase its capacity through acquisition or new construction, the court will consider this argument in connection with its analysis of entry barriers in the beef industry.

In summary, the court finds that the relevant product in the output market includes boxed beef produced at integrated facilities and by independent fabricators. This product market also includes the capacity of current producers of boxed beef to increase their production in response to an increase in the price of boxed beef.

## 2. Geographic Market

The parties agree that the market for the sale of boxed beef is national in scope, however, the defendants maintain that the geographic market should be expanded to include beef that is imported from other countries.

▋ The court rejects the defendants' contention that the relevant market should include imported beef. The evidence at trial indicated that the great majority of imported beef is ground beef which is ultimately used in the production of sausage and hamburger. The court has previously found that ground beef should not be included within the relevant product market.

Therefore, for the reasons already discussed, imported ground beef should not be included in the relevant geographic or product market.

## VI. PROBABLE EFFECT OF THE PROPOSED ACQUISITION

 Section 7 of the Clayton Act prohibits mergers where in a relevant product and geographical market "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18 (1950). To establish a violation of Section 7 of the Clayton Act, therefore, a plaintiff need only demonstrate that the effect of an acquisition "may" be substantially to lessen competition. The Clayton Act provides "authority for arresting mergers at a time when the trend to a lessening of competition in a line of commerce [is] still in its incipiency." *Brown Shoe, supra,* 370 U.S. at 317, 82 S.Ct. at 1520. For a given merger to be proscribed, however, more is required than a "'mere possibility' of the prohibited restraint...." *F.T.C. v. Consolidated Foods,* 380 U.S. 592, 598, 85 S.Ct. 1220, 1224, 14 L.Ed.2d 95 (1965); *United States v. M.P.M., supra,* at 90. "... Section 7 deals in 'probabilities,' not 'ephemeral possibilities.'" *United States v. Marine Bancorporation, supra,* 418 U.S. at 622–23, 94 S.Ct. at 2870; *Brown Shoe Co., supra,* 370 U.S. at 323, 82 S.Ct. at 1522.

 Market shares and industry concentration have traditionally been viewed as two of the most important factors used in measuring the likely anticompetitive effect of an acquisition challenged under Section 7 of the Clayton Act. *Brown Shoe Co., supra,* at 321, 82 S.Ct. at 1521. Furthermore, sufficiently high concentration and market share statistics can result in a prima facie showing of a violation of Section 7 of the Clayton Act. *See, United States v. Philadelphia Nat'l Bank, supra,* 399 U.S. at 363, 83 S.Ct. at 1741; *United States v. M.P.M., supra,* at 91.

There is no clear rule regarding what level of concentration or market share is necessarily violative of Section 7 of the Clayton Act; however, the Supreme Court has held acquisitions to be violations of Section 7 when the statistical indications showed relatively low market shares resulting from the acquisition. *See, e.g., United States v. Pabst Brewing Co.,* 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966) (nationwide market for the sale of beer, combined market share of the acquired and acquiring company was 4.49% of total sales); *United States v. Von's Grocery Co.,* 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966) (Los Angeles market for the sale of retail groceries, combined market share was 7.5% of total sales). In recent years, these cases have been strongly criticized. R. Posner, *Antitrust Law* 105–09 (1976); R. Bork, *The Antitrust Paradox* 217–218 (1978). Nevertheless, the decisions point out that even when post merger market shares remain relatively low, the acquisition may be anticompetitive when considering conditions of the relevant markets.

 Statistical evidence, however, is not conclusive on this issue. Rather, it is necessary to conduct a further examination of the particular market in terms of its structure, history, and probable future, in order to judge whether there is a likely anticompetitive effect stemming from a merger. In making such an analysis, it is important to consider the level of concentration and tendency toward concentration in the industry, *see, Brown Shoe, supra,* 370 U.S. at 344, 82 S.Ct. at 1534, as well as the ease of entry or barriers to entry into the relevant market. *See, United States Steel Corp. v. F.T.C.,* 426 F.2d 592, 605 (6th Cir.1970).

 In the instant case, the court finds that there is not merely an "ephemeral possibility" of an anticompetitive effect arising out of the proposed acquisition; rather, there is a distinct and significant probability that the proposed acquisition would harm competition in both the input and the output markets.

### A. Input/Procurement Market

The evidence at trial demonstrated that the twelve state market for the procure-

ment of fed cattle is highly concentrated. In 1982, the four largest firms accounted for 52% of the fed cattle slaughtered in the relevant geographic market. The two largest firms, IBP and Excel, accounted for 37.7% of the fed cattle slaughtered in the market. Ex. 74 (Pace Testimony, Table 6 and Table 7).

The evidence at trial further indicated a trend toward increased concentration in this market. Over the past five years, the four firm ratio in the procurement market has increased from 37.3% to 52%. *Id.*

The proposed acquisition would further increase the high level of concentration in this market. The four-firm ratio in the procurement market would increase from 52% to 57.5% if Excel is permitted to acquire Spencer Beef. More significantly, following the completion of the proposed acquisition, Excel and IBP would have an estimated market share of 44.8% in the twelve state market for the procurement of fed cattle. *Id.*

The concentrated nature of this market and the potential effect of the proposed acquisition is also demonstrated by an analysis of the relative capacities of the firms in this market. The evidence indicated that firms are "efficient" if they have the capacity to slaughter at least 1,000 head of cattle per day. In fact, the testimony indicated that a plant is relatively inefficient unless it has a slaughter capacity of 1,200 to 1,500 head of cattle per day. T. Monfort; T. Neubauer (Ex. KKKKKKK at 3). An effective measure of market share, therefore, is a firm's capacity compared to the total capacity of all firms with the ability to slaughter over 1,000 head per day. In 1982, the four largest firms in the procurement market possessed 60.5% of the "efficient capacity" in the market. Ex. 74 (Pace Testimony, Table 10, Shares of Fed Cattle Slaughter Plants with Reported Capacities exceeding 1,000 Head a Day 12-State Area April 1983). This four firm ratio would increase to 68.4% if Excel acquires Spencer Beef. Furthermore, the proposed acquisition would result in Excel and IBP possess-

ing 52.1% of the "efficient capacity" in the procurement market. *Id.*

Concentration levels and market share figures indicate that the proposed acquisition may realistically harm competition in the procurement market. This conclusion is further supported by the court's previous findings regarding the trend toward concentration in the procurement market.

**B. Output/Sales Market**

The evidence at trial also demonstrated a high level of concentration and a trend toward even greater concentration in the market for the sale of boxed beef. The four largest firms in the market accounted for 53.8% of the boxed beef produced by integrated slaughterer-fabricators and independent fabricators in 1982. Ex. 74 (Pace testimony, Table 3, Production of Boxed Beef by Five Largest Packers as a Percent of Estimated Total Production by Slaughterer-Fabricators and Independent Fabricators 1982). This four firm ratio would increase to 59.5% if Excel is permitted to acquire Spencer Beef. *Id.* More significantly, however, IBP and Excel would have a combined market share of 47.7% following completion of the proposed acquisition. *Id.*

The affect of the proposed acquisition can also be seen by analyzing the relative capacities of the firms in the relevant market. The four largest firms in the output market possessed 44.6% of the fabrication capacity within the output market in 1982. Ex. MMMMMMM (Burnett Testimony); Ex. KKKKK, Table C. This four firm ratio would increase to 49.2% if Excel is permitted to acquire Spencer Beef. *Id.* In addition, Excel and IBP would possess approximately 39% of the fabrication capacity in the relevant market following completion of the proposed acquisition.

The "capacity" share figures are even more indicative of the anticompetitive effect of the proposed acquisition if one calculates market shares with respect to the "efficient capacity" in the market. As noted above, firms are generally considered "efficient" if they have the capacity to

fabricate the equivalent of at least 1000 head of cattle per day. In 1982, the four largest firms in the output market possessed 63.9% of the total capacity of all firms with the ability to fabricate at least 1000 head per day. Ex. 74 (Pace Testimony, Table 5). This four firm ratio would increase to 71.5% if Excel is permitted to acquire Spencer Beef. In addition, Excel and IBP currently possess 48.1% of the efficient capacity in the output market. If Excel is permitted to acquire Spencer Beef, Excel and IBP would have a total of 55.9% of the efficient capacity within the output market. *Id.*

Clearly, the concentration levels and market share figures delineated indicate that the proposed acquisition may harm competition in the relevant market for the sale of boxed beef. This conclusion is further supported by the statistical and non-statistical evidence discussed above regarding the trend toward concentration in the output market. Accordingly, the court finds that the plaintiff has made a prima facie showing that the proposed acquisition violates Section 7 of the Clayton Act.

### C. Entry Barriers

A party seeking to enter one or both of the markets defined above could secure such entry by building new facilities or by acquiring facilities currently in existence. There are, however, significant entry barriers which would limit potential entrants regardless of whether they sought entry through new construction or acquisition.

Although testimony differed regarding the overall cost and time period associated with building new slaughter and fabrication facilities, the evidence indicated that such costs and time delays represent significant barriers to entry into the relevant markets. Mr. Monfort testified that a minimally viable size for an integrated plant would be a plant with a capacity to slaughter and fabricate 1,500 head of cattle per day. Mr. Monfort further testified that construction of such a plant would cost approximately $40 million. In addition, Mr. Monfort stated that it would take three to

six months to plan such a plant, and an additional year to construct the plant. Mr. Neubauer, on the other hand, testified that a plant would be viable if it had the capacity to slaughter and fabricate 1,200 head per day. Mr. Neubauer estimated that it would cost approximately $20 million to build such a plant, and the planning and construction of the plant could be completed within twelve to eighteen months. Mr. Neubauer further testified that an independent slaughter or fabrication facility would cost approximately $10 million. Ex. KKKKKKK (Neubauer Testimony, ¶¶ 10–13, 16, 30).

The court rejects defendants' contention that these costs and delays do not constitute barriers to potential entrants into the relevant markets. Defendants' internal documents amply support the proposition that the large capital costs needed for entry into the market, combined with the previously discussed low profit margins in the beef industry, represent formidable barriers to new entrants.

> We do not anticipate any increase in competition within the foreseeable future for two reasons: poor profitability within the business, and large capital requirements needed for new plant and equipment.

Ex. 70 (MBPXL LRPC Report, January 25, 1982).

Significant barriers also restrict entrance into the relevant markets by firms seeking to acquire existing facilities. Initially, the court notes that substantial refurbishing costs typically face any firm seeking to acquire such facilities. More significantly, however, the evidence at trial indicated that the lack of available facilities is also a limit on entry through acquisition. T. Monfort. The testimony is in conflict on this point in that Mr. Neubauer testified that there are numerous facilities available for acquisition. The defendants' own documents, however, indicate the lack of such facilities. In this regard, Excel's internal memoranda clearly indicate that it decided to acquire the Spencer Beef plants, in part, because they are the only viable integrated facilities available within the twelve state

procurement market. Ex. 30 at 7. (Changes in the Beef Packing Industry, Notes for Caprock Annual Meeting, June 24, 1983).

We are persuaded that both the lack of facilities and the cost associated with refurbishing old facilities constitute significant barriers to any party seeking to enter the market by acquiring existing facilities.

There are additional factors which serve as barriers for entry into the input and output markets. Mr. Monfort testified that even if one can finance the costs of initial construction or acquisition, the industry is such that it takes a substantial amount of time to achieve even a minimum level of market penetration. In addition, there are "psychological" barriers to new entrants arising out of the high level of concentration in the beef industry. Ex. 16 at 7 (MBPXL LRPC Report, January 1981). Although these factors, standing alone, do not constitute absolute entry barriers, they certainly restrict access to the input and output markets.

The evidence at trial indicated that there has been just one major entrant into the two relevant markets in recent years, the Val-Agri Company. In March 1983 Val-Agri entered the industry by purchasing existing plants in Garden City, Kansas and Amarillo, Texas. There are conflicting estimates regarding the overall cost incurred by Val-Agri in acquiring and refurbishing its plants. Nevertheless, it appears that the total price was at least $25 million.

We are not persuaded that Val-Agri's entry into the beef industry indicates a lack of significant entry barriers. Initially, the court notes at this time Val-Agri has yet to commence full operations. Therefore, it is difficult to assess its impact within the two relevant markets. More significantly, however, the court notes that Val-Agri entered the industry through acquisition of existing facilities. As we mentioned above, defendants' own documents indicate a lack of additional viable plants available for acquisition within the relevant markets.

We also note that the meat packing industry, as it relates to the issues in this case, may be characterized as a mature industry. No substantial changes in the industry can be expected. T. Monfort. Greater automation or use of processing robots are not anticipated in the foreseeable future. Thus, a new entrant into the market will be unable to acquire market power by developing or adopting new processing techniques. Rather, the mature nature of the industry will enhance the ability of the current industry leaders to continue their domination of the input and output markets described above.

### D. The Size of the Acquiring Entity

The size of the acquiring and acquired entities is a relevant factor in assessing the likely effect of a proposed acquisition. *Kennecott Copper Corp. v. F.T.C.*, 467 F.2d 67, 78 (10th Cir.1972), *cert. denied*, 416 U.S. 909, 94 S.Ct. 1617, 40 L.Ed.2d 114 (1974); *see also Reynolds Metals Co. v. F.T.C.*, *supra*, at 229. In *Kennecott, supra*, the Court of Appeals for the Tenth Circuit explained the importance of considering the potential effect of an acquisition involving parties with great financial resources:

> Kennecott takes strong exception to the Commission's consideration of the anticompetitive effect of its great financial resources.... The Commission reasoned that it was likely that this "deep pocket" of funds would be employed to acquire vast coal reserves and massive mining developments to enable Kennecott to compete for long-term utility supply contracts and thus to gain more market share....
>
> It was reasonable for the Commission to conclude that Kennecott would use its immense resources to gain for Peabody, already the number one producer in the industry, an even larger share of a market which promises to be a concentrated one in a relatively short time.

*Id.* at 79.

The court is aware that *Kennecott* involved the merger of two large corporations with tremendous resources, while the

instant case involves one large corporation acquiring a relatively smaller operation. However, the analysis used by the court in *Kennecott* is applicable in this case as well because the proposed acquisition would result in the beef industry being dominated by two corporate giants, Cargill and Occidental Petroleum Corporation.

As noted, defendant Excel is a wholly owned subsidiary of Cargill. In fiscal year 1981–82, Cargill, Inc. reported annual sales in the billions of dollars. (See sequestered Appendix A filed with the Clerk of the Court.) In addition, Cargill, as Excel's parent, financed a great deal of Excel's recent growth. Ex. 17 (MBPXL LRPC Report, April 1981); Ex. 31 (Commitment Request, Feb. 28, 1983 and Cargill memo from W. Watson to Finance Comm., Feb. 28, 1983). In fact, Excel was able to enter into the proposed acquisition, in part, because Cargill unconditionally guaranteed Excel's performance and payment of a multi-million dollar sum under the acquisition agreement. Ex. 3 at 30 (Asset Purchase and Sale Agreement, June 17, 1983).

Of considerable import is the fact that IBP, the acknowledged market-share leader in both relevant markets is a wholly owned subsidiary of another corporation with tremendous financial resources, Occidental Petroleum Corporation. Ex. 65 at Doc. I.D. No. 1507.

The proposed acquisition, as discussed above, would result in both relevant markets being dominated by IBP and Excel. The enormous financial resources available to these two firms lends further support to the conclusion that the proposed acquisition would tend to harm competition in both the input market and the output market.

It is clear for the reasons outlined that the proposed acquisition would tend to harm competition in the regional market for the procurement of fed cattle and the national market for the sale of boxed beef. Accordingly, the court finds that the proposed acquisition violates Section 7 of the Clayton Act.

## VII. IMPACT OF PROPOSED ACQUISITION ON MONFORT OF COLORADO

Section 16 of the Clayton Act authorizes injunctive relief against injuries threatened by activities that violate the antitrust laws. 15 U.S.C. § 26. In our earlier discussion regarding Monfort's standing to sue under Sections 7 and 16 of the Clayton Act, we found that Monfort had *alleged* the likelihood of an antitrust injury sufficient to satisfy the standing requirements developed by the Supreme Court in *Brunswick, supra,* and *Associated General Contractors, supra.*

As the Supreme Court has noted, a plaintiff seeking injunctive relief need only show that an injury is threatened as a result of defendants' anticompetitive conduct which violates the antitrust laws, *Zenith Corp., supra.* Under Section 16 the plaintiff must show that a significant threat of injury exists and that the injury is causally or proximately linked to defendants' anticompetitive conduct. 15 U.S.C. § 26; *United States v. Borden Co.,* 347 U.S. 514, 74 S.Ct. 703, 98 L.Ed. 903 (1954); *Calnetics v. Volkswagen of America, Inc.,* 532 F.2d 674 (9th Cir.1976), *cert. denied,* 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976); *Industrial Communications Systems, Inc. v. Pacific Telephone and Telegraph Co.,* 505 F.2d 152 (9th Cir.1974).

While the injury complained of must be personal to the plaintiff it need not be an injury to the plaintiff's business or property, as is the case where treble damages are sought under Section 4 of the Clayton Act, 15 U.S.C. § 15. In addition, because treble damages are not a possibility the injury requirement under Section 16 is arguably less of a factor than under Section 4 of the Clayton Act.

It is our view that the plaintiff has established a substantial and significant threat of injury personal to itself if the planned acquisition is permitted to go forward. Further, the plaintiff has shown that the prospective injury is causally or proximately related to the defendants'

planned acquisition of Spencer Beef. We have earlier determined that the proposed acquisition is violative of Section 7 of the Clayton Act, 15 U.S.C. § 18.

Plaintiff maintains that the planned acquisition will place it in a position such that it will be unable to remain a viable competitor in the beef slaughtering and fabrication industry. Monfort contends that it will be driven out by the impact of heightened competition between Excel and IBP in their quest for increased market share. It is Monfort's position that the increased market share desired by Excel will come at the expense of smaller operators such as Monfort rather than at the expense of IBP. Indeed Excel's internal memoranda reveal the intensity of Excel's quest for a greater share of the market:

> It is critical that we grow in market share during the present instability in the beef processing industry. We must gain shares from the leader (IBP) and inhibit the smaller processor's share.

Exhibit 24 at 4 (Excel LRPC Report, January 24, 1983). This document emphatically supports Monfort's argument that Excel plans to take steps to manipulate the market in an effort to inhibit small processors and acquire an increased market share.

While Monfort does not allege that IBP and Excel will in fact engage in predatory activities as part of the cost-price squeeze, the market shares that would exist following the acquisition, coupled with the acknowledged difficulties in acquiring greater market share by other methods make such practices a distinct possibility. The likelihood of predatory pricing is heightened by the vast financial resources available to both Excel and IBP, resources not available to the plaintiff.

Monfort is realistically threatened with a significant injury personal to itself. Moreover, the threatened injury is proximately related to the violation of Section 7 of the Clayton Act that would result from Excel's planned acquisition of Spencer Beef. Unlike the situation in *Brunswick, supra,* the threat to Monfort would not exist if another entity, other than Excel or IBP, planned to acquire the assets of Spencer Beef.

We find that Monfort has satisfied the prerequisites necessary to seek injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.

## VI. CONCLUSION

The court finds that the effect of the proposed acquisition may be substantially to lessen competition or tend to create a monopoly in the regional market for the procurement of fed cattle and in the national market for the sale of boxed beef. Therefore, the proposed acquisition violates Section 7 of the Clayton Act.

The proposed acquisition would also result in a significant threat of irreparable injury to Monfort of Colorado and to the public interest. The plaintiff has satisfied the requirements under Section 16 of the Clayton Act and is entitled to injunctive relief pursuant to that section. The acquisition of Spencer Beef by the defendants will be permanently enjoined.

Given the court's finding with respect to Section 7 of the Clayton Act, the court does not reach or decide the question of whether the proposed acquisition violates Section 1 of the Sherman Act.

The court also finds that the plaintiff is entitled to an award of costs and reasonable attorney's fees pursuant to 15 U.S.C. § 26. Plaintiff's complaint contains a claim for costs and attorneys' fees, and the plaintiff has substantially prevailed on its claim. Accordingly, the plaintiff is entitled to an award of costs and reasonable attorneys' fees.

## ORDER

IT IS HEREBY ORDERED that defendants Excel Corporation and Cargill, Inc. are PERMANENTLY ENJOINED from consummating the proposed acquisition between Excel Corporation, Cargill, Inc., and the Spencer Beef Division of Land O'Lakes, Inc. The defendants are further ENJOINED from undertaking any plan or entering into any agreement, the effect of

which would be to allow the acquisition, merger, consolidation, operation or in any other way permit the combination of the ownership or operation of the beef packing businesses of defendants and the Spencer Beef Division of Land O'Lakes, Inc. Judgment will enter for Plaintiff Monfort of Colorado on its claim for injunctive relief.

IT IS FURTHER ORDERED that plaintiff Monfort of Colorado, as a prevailing party, is entitled to an award of costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 26. The Court will enter additional orders at a later date regarding the award of attorneys' fees.

Accordingly, the Clerk of the Court is hereby DIRECTED to enter judgment in favor of plaintiff, Monfort of Colorado, and against the Defendants, Cargill, Inc. and Excel Corporation, on plaintiff's complaint for injunctive relief.