**MONFORT OF COLORADO, INC.,
Plaintiff-Appellee,**

v.

**CARGILL, INC. and Excel Corporation,
Defendants-Appellants.**

No. 83–2588, 84–1305.

United States Court of Appeals,
Tenth Circuit.

April 23, 1985.

Robert F. Hanley (Ronald G. Carr, Alan K. Palmer, and W. Stephen Smith with him on the briefs), of Morrison & Foerster, Denver, Colo., for defendants-appellants.

William C. McClearn (James E. Hartley and Marcy G. Glenn with him on the briefs) of Holland & Hart, Denver, Colo., for plaintiff-appellee.

Before LOGAN, BREITENSTEIN, and McWILLIAMS, Circuit Judges.

LOGAN, Circuit Judge.

Monfort of Colorado, Inc. has brought this private antitrust action seeking to enjoin its competitor, Excel Corporation, a wholly owned subsidiary of Cargill, Inc. (hereinafter defendants or Excel), from acquiring another competitor, Spencer Beef Division of Land O'Lakes, Inc. Defendants appeal the district court's grant of a permanent injunction prohibiting Excel from acquiring Spencer Beef. *See Monfort of Colorado, Inc. v. Cargill, Inc.,* 591 F.Supp. 683, 710–11 (D.Colo.1983). Defendants also appeal an enforcement order that the district court issued after defendants acquired one of Spencer Beef's plants in spite of the original injunction.

Plaintiff Monfort packs and fabricates beef at plants in Greeley, Colorado, and Grand Island, Nebraska. It is the fifth largest beef packer in the country. Defendants Cargill and Excel operate four integrated beef packing and fabrication plants in Kansas, Missouri, and Texas, a slaughter facility in Nebraska, and a fabrication plant in Kansas. Excel is the second largest beef packer in the United States. Its parent company operates subsidiaries in at least thirty-five countries.

Spencer Beef, which Excel seeks to acquire, is a division of the agricultural cooperative Land O'Lakes, Inc. and was the third largest beef packer in the United States when all of its plants in Spencer, Iowa, Oakland, Iowa, and Schuyler, Nebraska were operating. Spencer's Schuyler plant, which has been closed for more than two years, 591 F.Supp. at 689, is approximately sixty miles from Monfort's Grand Island plant. Spencer and Land O'Lakes are not parties to this litigation, although at one time they sought to intervene. *See Monfort of Colorado, Inc. v. Cargill, Inc.,* No. 84–1060 (10th Cir. Aug. 8, 1984) (appeal dismissed).

Monfort brought this suit in July 1983, seeking an injunction under section 16 of the Clayton Act, 15 U.S.C. § 26. It claimed that Excel's proposed acquisition of Spencer Beef would violate section 7 of the Clayton Act, 15 U.S.C. § 18, and section 1 of the Sherman Act, 15 U.S.C. § 1. This case presents the significant threshold issue of whether a company has standing to seek a section 16 injunction against its competi-

tor's horizontal acquisition of a competing firm. It also presents questions concerning the propriety of the proposed acquisition under section 7, as well as the propriety of a partial acquisition of assets once a district court has enjoined the originally proposed transaction. We find that Monfort has antitrust standing, that the district court properly granted Monfort's request for an injunction, and that Excel's subsequent acquisition of a Spencer Beef plant violated this injunction. Therefore, we affirm the district court's judgments.

## I

### A

The threshold issue is whether Monfort has antitrust standing to challenge this merger. The landmark case governing analysis of antitrust standing is *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), with its oft-quoted holding that "[p]laintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* at 489, 97 S.Ct. at 697 (emphasis in original). *Brunswick* involved a claim for damages under section 4 of the Clayton Act; the Court there was particularly concerned with section 4's specific reference to injury: suit may be brought only by persons "who shall be injured." *See* 429 U.S. at 485–86, 97 S.Ct. at 695–96. In section 16 injunction cases, however, the courts do not require proof of actual injury because they need not calculate damages. Instead, they follow section 16's command to apply equitable standards for an injunction. *See, e.g., Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 407–08 (1st Cir.1985); *Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.*, 753 F.2d 1354, 1357–58 (6th Cir.1985), *cert.*

*dismissed,* —— U.S. ——, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985). The Supreme Court has held that because section 16 does not require actual injury it does not foreclose antitrust claims for which the injury has yet to occur. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969).

The antitrust claims in this case and in *Brunswick* involve both a remedial statute, section 16 or section 4, and a substantive statute defining the antitrust violation, section 7 of the Clayton Act. To obtain antitrust standing a plaintiff must meet the threshold requirements of both the remedial and substantive statutes. In *Brunswick* the Court observed that to recover section 4 damages for a section 7 violation a plaintiff must prove more than that defendant violated section 7. *See* 429 U.S. at 486, 97 S.Ct. at 696. The same is true in a section 16 case, but the threshold of proof beyond the section 7 violation remains lower than it would be in a section 4 case. *See Board of Regents of the University of Oklahoma v. National Collegiate Athletic Association*, 707 F.2d 1147, 1151 (10th Cir.1983), *aff'd,* —— U.S. ——, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) (certiorari not sought on standing issue, *id.* at —— n. 14, 104 S.Ct. at 2958 n. 14); *see also Schoenkopf v. Brown & Williamson Tobacco Corp.*, 637 F.2d 205, 210 (3d Cir. 1980). The practical result of this distinction is that in a section 16 case, because actual injury need not be shown, it is much easier for a plaintiff to show causation of its hypothetical antitrust injury by a putative antitrust violation. The Court in *Brunswick* recognized this distinction by not foreclosing plaintiffs in that case from seeking an injunction even though they lacked standing to seek damages.[1] *See* 429 U.S. at 491, 97 S.Ct. at 698.

---

1. We also note that Professor Areeda's law review article which apparently influenced much of the *Brunswick* analysis, *see, e.g.,* 429 U.S. at 487 n. 11, 97 S.Ct. at 696 n. 11, recognized potential differences between antitrust standing analysis in claims for section 4 damages and analysis in claims for section 16 injunction. *See* Areeda, *Antitrust Violations Without Damage Recoveries,* 89 Harv.L.Rev. 1127, 1139 (1976) (denying standing to section 4 plaintiffs "does not leave society remediless, however, as both private equitable relief and government action are avail-

Therefore, when we consider *Brunswick*'s requirements for antitrust standing in this section 16 case, the Court's concerns with restricting section 4 cases, in part because of the peculiar risks of unrestrained treble damages claims, are of little consequence. *See, e.g., id.* at 485–88, 97 S.Ct. at 695–97; *see also Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 543–45, 103 S.Ct. 897, 911–13, 74 L.Ed.2d 723 (1983) (discussing problems of duplicate recovery and complex apportionment of awards in section 4 cases); *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 473–75, 475 n. 11, 102 S.Ct. 2540, 2545–46, 2546 n. 11, 73 L.Ed.2d 149 (1982); *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 746, 97 S.Ct. 2061, 2074, 52 L.Ed.2d 707 (1977) (Clayton Act section 4 was intended to compensate victims of antitrust injury as well as to deter antitrust violations). Thus most of the Supreme Court and lower court cases that have addressed antitrust standing are distinguishable in a section 16 case because they involve treble damages and section 4's actual injury requirement.

■ In a section 16 case, *Brunswick* mandates only an inquiry into the causal connection between the threatened injury and the putative antitrust violation. If a plaintiff surmounts this causation hurdle it has standing to seek an injunction. Of course it still must satisfy section 16's requirements in order to obtain the injunction,[2] and in the course of doing so it will have to prove a substantive antitrust violation such as the section 7 violation alleged here. The Supreme Court has said that this causation inquiry is like proximate cause analysis, *see Blue Shield,* 457 U.S. at 477, 102 S.Ct. at 2547; *Associated General Contractors,* 459 U.S. at 535–36, 103 S.Ct. at 907–08. To decide whether Monfort has antitrust standing, we now consider whether Excel's increased market power after acquisition of Spencer Beef would be a proximate cause of Monfort's threatened injury.[3]

**B**

Excel and Monfort are direct horizontal competitors in the beef packing and fabricating business. Excel contends that competitors generally should be denied standing to challenge a merger because they actually benefit from any increased concentration in the industry. Excel argues, in effect, that Monfort would have fewer competitors if the proposed merger were consummated and thus would accrue some of

able."); *see also* II P. Areeda & D. Turner, *Antitrust Law* ¶ 335e at 176 (1978) (noting important differences between section 4 damage actions and section 16 injunctive actions); L. Sullivan, *Antitrust* § 247 at 772 (1977) (noting lower threshold for section 16 actions because loss must only be threatened).

2. Section 16 specifically refers to common law standards for equitable relief. Excel has not specifically objected to the district court's finding that Monfort satisfied section 16's requirements for impending harm. *See* 591 F.Supp. at 709–10. Excel does object to some of the fact findings supporting the injunction and we dispose of those objections in Section II, *infra.* But Monfort's allegations in its brief that it satisfied the requirements of section 16 are not answered or specifically denied in Excel's reply brief.

The Sixth Circuit applied section 16 standards to determine the propriety of a preliminary injunction in a competitor's challenge to a merger when it, like we, concluded that the competitor had standing because causation between the an-

titrust violation and the injury had been shown. *See Christian Schmidt Brewing Co.,* 753 F.2d at 1356, 1358. We think it is more productive for courts to focus their efforts on section 16's judicially ascertainable prerequisites to relief rather than be forced to delve into the merits to determine standing, a task that should be a threshold inquiry.

3. One possible argument against Monfort having antitrust standing here is that the harm it may suffer from the reopening of Spencer Beef's Schuyler plant would occur regardless of which parent company reopened the plant. This, of course, was the basis for the Supreme Court's dismissal of the *Brunswick* claims. *See* 429 U.S. at 487, 97 S.Ct. at 696. Monfort's alleged harm goes beyond the rejuvenation of the Schuyler plant, however. Monfort is concerned with potential predatory operation of all Spencer Beef and Excel plants, all but one of which are currently in use. It is claiming that additional market power would give these plants coercive strength that they previously lacked even when operating at full capacity.

the advantages of oligopoly rather than suffer any antitrust injury. Excel also suggests that even if Monfort suffers from the merger it would only be suffering the effects of competition; it alludes to the statement, recently reaffirmed in *Brunswick,* that the "antitrust laws were enacted for 'the protection of *competition,* not *competitors.'*" *Brunswick,* 429 U.S. at 488, 97 S.Ct. at 697 (emphasis in original) (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962) ).[4]

In support of its theory that the acquisition may injure competition, Monfort does not claim that consumers of beef will immediately be hurt by higher beef prices. Indeed, Monfort would surely benefit if beef prices rose following Excel's acquisition. Instead Monfort claims that Excel will be able to engage in what we consider to be a form of predatory pricing in which Excel will drive other companies out of the market by paying more to its cattle suppliers and charging less for boxed beef that it sells to institutional buyers and consumers. The resulting cost-price squeeze will, according to Monfort, reduce its profit margin and drive it and other companies out of business. Once that occurs Excel will then use its market power to charge monopoly prices for its beef. Thus, according to Monfort, the harm to competition will follow an intense, but ersatz, period of competition during which Excel will increase its market share. Although Monfort does not discuss less drastic results, it is also possible that such a pricing strategy could enable Excel to demonstrate its price leadership to its competitors and force them to follow its artificially high boxed beef prices. Such a result would probably help Monfort but hurt competition by promoting tacit collusion. Monfort contends that Excel would be better able to engage in such a sustained period of predatory pricing if it possessed the additional market power that would come with increased market share

following acquisition of Spencer Beef. Thus it claims that the harm to competition, as well as the injury it will suffer as a competitor, is directly tied to the putative Clayton Act section 7 violation.

Excel does not deny that such a pricing strategy could occur; instead it advances an economic theory, using Chicago School concepts, *cf.* Easterbrook, *Predatory Strategies and Counterstrategies,* 48 U.Chi.L.Rev. 263, 266 (1981) ("it is exceedingly hard to distinguish 'predatory' strategies from ordinary competition."), which characterizes such pricing as pure competition. According to this theory, Excel would simply be using its superior skill, foresight and industry to increase its market share and drive inefficient competitors like Monfort from the marketplace.

Legal scholars have vigorously debated the nature and very existence of predatory pricing. *See, e.g.,* Easterbrook, *supra* (reviewing some of the recent theories and proposing own theory that if predation does occur, its harms are not worth policing). But the courts have continued to find that predatory pricing, when proved, violates the antitrust laws. *See, e.g., MCI Communications v. AT & T,* 708 F.2d 1081, 1112–13 (7th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983) (recognizing potential violation based on predatory pricing but finding insufficient evidence in case under consideration); *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 668 F.2d 1014, 1031–38 (9th Cir.1981), *cert. denied,* 459 U.S. 825, 103 S.Ct. 58, 74 L.Ed.2d 61 (1982) (establishing rules for predatory pricing cases). *Brunswick* itself mentions predatory pricing as an evil the antitrust laws are intended to prevent. 429 U.S. at 489 n. 14, 97 S.Ct. at 698 n. 14. Thus, we too decline to embrace the theory that predatory pricing is just true competition. Respected commentators do not agree on even the fundamental aspects of the evils of

---

**4.** This talismanic language is unhelpful here as it readily appears that Monfort's harm as a competitor may be a subset of the overall harm to competition. We are not prepared to dismiss

every case that presents harm to specific competitors. Indeed, we are looking for such harm as part of our standing inquiry.

oligopoly, much less the implications of predatory pricing. *See, e.g.,* II P. Areeda & D. Turner, *Antitrust Law* ¶ 404 at 272–79 (1978); R. Bork, *The Antitrust Paradox,* 178–91 (1978); R. Posner, *Antitrust Law: An Economic Perspective* 42–55 (1976).

■ Our problem is made more difficult, however, because the predation in this case is only threatened. We lack the ordinary guideposts such as marginal cost and average variable cost that might otherwise highlight a violation. Whether Monfort would suffer any injury from Excel's acquisition depends on how long Excel engaged in predatory pricing. If Excel did so only for a short time and did not drive Monfort out of business, Monfort would probably benefit from the likely decrease in price competition caused by Excel's price leadership. But if Excel engaged in sustained predatory pricing Monfort and other companies could be driven out of business, the beef packing industry would become more concentrated, and it is likely that competition would be substantially lessened because of tacit collusion. Congress intended section 7 of the Clayton Act to prevent either circumstance; yet Monfort would only be harmed by sustained predatory pricing.[5] It is impossible to tell in advance of the acquisition which situation would occur, if either.

Monfort has alleged a plausible theory for how it may be injured by Excel's putative section 7 violation. It is commonplace that Congress intended section 7 of the Clayton Act as "a prophylactic measure, intended 'primarily to arrest apprehended consequences of intercorporate relationships before those relationships could work their evil....'" *Brunswick,* 429 U.S. at 485, 97 S.Ct. at 695 (quoting *United States*

*v. E.I. du Pont de Nemours & Co.,* 353 U.S. 586, 597, 77 S.Ct. 872, 879, 1 L.Ed.2d 1057 (1957) ). Congress feared concentration of economic power, *see Brown Shoe Co. v. United States,* 370 U.S. 294, 315–16, 82 S.Ct. 1502, 1518–19, 8 L.Ed.2d 510 (1962), and provided public and private remedies for challenging mergers that would increase industry concentration and diminish competition. Monfort's theory of injury is logically related to harm caused by increased concentration of economic power.

We recognize that special concerns do arise when competitors have the power to challenge each other's corporate acquisitions. Competitors may invoke the pro-competitive goals of antitrust statutes yet intend to bring about anticompetitive results. For example, a company may want to block its competitor's efficient acquisition despite FTC or Justice Department preclearance simply because the challenging company fears it will not be able to match its competitor's newly acquired efficiencies such as economies of scale. Nevertheless, Congress created a private remedy for enforcing section 7 and hence apparently did not think that all private challenges would be spurious.

Excel contends, in effect, that all private challenges by competitors should be forbidden. Yet even the Justice Department amicus brief, filed in an unrelated suit, that it cites for support does not advocate this drastic position.[6] The Justice Department specifically said that it was "not suggesting that competitors never have standing to seek injunctive relief against mergers or joint ventures involving their rivals." Appellants' Brief, Appendix at 14. It merely asked the court in that case to engage in searching scrutiny of private plaintiffs' allegations of injury, aware that a govern-

---

5. Monfort could argue that it would be hurt by Excel's price leadership even if it continues in business because it would be coerced from vigorously competing in a way that might expand its own market share. We are satisfied, however, that Monfort would reap substantial profits at least in the short term from an interdependent price structure because it and other firms could charge supracompetitive prices.

6. The Justice Department filed its amicus brief in support of General Motors' motion to dismiss the complaint for lack of standing in *Chrysler Corp. v. General Motors Corp.,* No. 84–115 (D.D. C.). The district court ultimately denied the motion to dismiss. 589 F.Supp. 1182, 1187–94 (D.D.C.1984).

ment entity has authority to sue if the acquisition offends the public interest.

The Supreme Court apparently contemplates legitimate suits by competitors to challenge corporate acquisitions. *See Brunswick*, 429 U.S. at 489 n. 14, 97 S.Ct. at 698 n. 14 ("competitors may be able to prove antitrust injury before they actually are driven from the market and competition is thereby lessened."). In *Blue Shield* the Court emphasized the importance of this passage to a correct understanding of its *Brunswick* holding. 457 U.S. at 482, 102 S.Ct. at 2550.

■ There have been relatively few instances of suits by competitors to enjoin acquisitions as being in violation of section 7 of the Clayton Act. But in all such cases that we have found the courts held that the competitor had standing under section 16.[7] *See Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 407–08 (1st Cir.1985); *Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.*, 753 F.2d 1354 (6th Cir.1985), *cert. dismissed,* — U.S. ——, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985); *Chrysler Corp. v. General Motors Corp.*, 589 F.Supp. 1182 (D.D.C.1984). We suspect these suits are filed rarely because horizontal competitors generally do not mind seeing one of their rivals swallowed

up. When they do sue they usually prefer the windfall of treble damages; then the propriety of their standing raises the special concerns involved in a section 4 claim. *See supra* section I(A). Our concern with whether competitors will file spurious antitrust suits is allayed by the requirements a plaintiff must meet. In addition to showing that the injury it is likely to suffer will be proximately caused by the section 7 violation if it occurs at all, the plaintiff must meet the stringent legal requirements of sections 7 and 16. Courts can expedite their hearing of such cases so that the mere threat of a challenge will not automatically foil a beneficial acquisition.

■ Here we agree with the district court that injury to competition is threatened by the antitrust violation of which Monfort complains. In 1982 four firms apparently handled 52% of the input and 53.8% of the output of the relevant products in what the district court found to be the relevant geographic markets, and Excel's acquisition of Spencer would give it 20.4% of the entire input and output markets. Although Monfort will only suffer antitrust injury if Excel abuses its market power, the causal connection will exist if the ultimate injury materializes. Therefore, we hold that Monfort has standing to

---

**7.** Our decision in *Pennzoil Co. v. Texaco, Inc.*, No. 84–1169 (10th Cir. Feb. 9, 1984), 1984–1 Trade Cas. ¶ 65,896, is not to the contrary. In that case Pennzoil sought to enjoin Texaco's merger with Getty Oil. The court affirmed the district court's denial of injunctive relief, but the decision was not based on any judgment as to plaintiff's antitrust standing. The court was simply analyzing whether plaintiff had satisfied the traditional requirements for injunctive relief such as a showing of a substantial likelihood of success on the merits; proof of irreparable harm; proof that the threatened injury outweighs the damage that an injunction would cause; and a showing that the injunction would not harm the public interest. These equitable concerns enter the analysis in a case such as the one we face here. But the court considers them at the stage when it determines whether a section 16 injunction is warranted for the section 7 violation; this occurs only after a plaintiff has met the causation requirement for antitrust standing.

In other section 7 cases courts have appeared to approve competitor antitrust standing. *See*

*Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 729 F.2d 1050, 1058 (6th Cir.1984) (plaintiff seeking both treble damages and injunctive relief), *cert. denied,* — U.S. ——, 105 S.Ct. 510, 83 L.Ed.2d 401 (1984); *In re Japanese Electronic Products Antitrust Litigation*, 723 F.2d 238, 318–19 (3d Cir.1983) (reversing trial court's denial of antitrust standing for claims seeking both treble damages and injunctive relief), *cert. granted,* — U.S. ——, 105 S.Ct. 1863, 85 L.Ed.2d 157 (1985). The vast majority of appellate cases concerning the antitrust standing of competitors in section 7 cases involve either the special problems of claims for treble damages, *see, e.g., A.D.M. Corp. v. Sigma Instruments, Inc.*, 628 F.2d 753 (1st Cir.1980) (per curiam); *Purex Corp. v. Procter & Gamble Co.*, 596 F.2d 881 (9th Cir.1979), *cert. denied*, 456 U.S. 983, 102 S.Ct. 2256, 72 L.Ed.2d 861 (1982); or a vertical relationship between companies, *see Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964 (5th Cir.1977) (claim for damages), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978).

seek an injunction that would block its competitor's acquisition. *Cf. Christian Schmidt Brewing Co.*, 753 F.2d at 1356–58 (concluding that competitor who alleged threatened predation had standing and could go on to trial to prove merits of section 7 violation). We now move to Excel's objections to the merits of the district court's determination that a section 7 violation was imminent.

## II

Excel also objects to the district court's resolution of the substantive issues in this case: its findings that a section 7 violation occurred and that a section 16 injunction was warranted. Excel contends that the district court incorrectly defined the product market and geographic market relevant to this acquisition. It also claims that the court should not have found that significant entry barriers exist; that the court failed to consider certain economic characteristics of the beef industry that constrain collusive behavior; and that the court should not have attributed any significance to Cargill's extensive financial resources as Excel's parent company.

## A

The district court found that fed cattle constitute the relevant product within the input market. 591 F.Supp. at 697. It considered and rejected Excel's argument that cows, bulls, and nonfed cattle[8] should also be included within the input product market, finding that these animals are not functionally interchangeable with fed cattle. *Id.* The court defined the geographic market for fed cattle to include all or part

of twelve midwestern and western states.[9] 591 F.Supp. at 698–99. The court considered and rejected Excel's contention that the market for fed cattle should encompass either the entire United States or at least the entire portion of the country east of the Rocky Mountains. *Id.*

The court defined the relevant product for the output market as all boxed beef produced either by independent fabricators or at integrated slaughter-fabrication facilities.[10] 591 F.Supp. at 703. The court considered boxed beef an economically significant product submarket within the beef industry. *Id.* at 701–03. The court considered and rejected Excel's argument that the relevant output product market should encompass all beef including, in addition to what it used for its product definition: ground beef, non-vacuum packed beef and carcass beef.[11] *Id.* at 701–03. It repudiated Excel's contention that the output market should include beef produced by "captive" fabrication facilities—facilities owned by retail supermarket chains. *Id.* at 703. The court also rejected Excel's contention that plants that currently fabricate cows, bulls, and nonfed cattle should be included because they might produce boxed beef if prices changed. *Id.* at 704. Finally, it declined to include fabricators who currently vacuum pack none or only a portion of their output because of a lack of evidence of whether such firms exist, and if they do, what amount of beef they produce. *Id.* The court defined the geographic market for boxed beef to encompass the entire United States. *Id.* at 704. It rejected Ex-

---

**8.** Fed cattle are steers and heifers that have been fattened in a commercial feedlot for a period of 100 to 140 days. 591 F.Supp. at 689. These cattle generally yield a higher grade of beef than nonfed cattle. *Id.* at 690. Cows and bulls are used for breeding and milk production.

**9.** This market included Nebraska, South Dakota, southern Minnesota, Wisconsin, Iowa, Illinois, Missouri, Kansas, eastern Colorado, Oklahoma, New Mexico, and the Texas panhandle. 591 F.Supp. at 698–99.

**10.** The term boxed beef refers to a process for cutting slaughtered cattle into parts which are then vacuum-packed and boxed for shipment. The term "fabricate" refers to the process whereby the slaughtered carcass is broken down. For further discussion of terms of art within the beef industry, see the district court's discussion at 591 F.Supp. at 689–90.

**11.** Carcass beef is beef sold in entire carcass form to wholesalers, retailers and independent fabricators for fabrication. Appellants' Brief at 38.

cel's argument that imported beef should be included. *Id.*

■ We review the district court's definition of relevant markets under the clearly erroneous standard. *Telex Corp. v. IBM Corp.,* 510 F.2d 894, 915 (10th Cir.), *cert. dismissed,* 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975). Excel raises on appeal the same arguments regarding market definition that it asserted unsuccessfully in the district court. The district court conscientiously addressed each contention. From our review of the record we cannot say that any of the district court's conclusions on market definition are clearly erroneous.

Excel would have preferred that the district court use the current Justice Department Merger Guidelines, 47 Fed.Reg. 28,-493 (1982), *revised,* 49 Fed.Reg. 26,823 (1984), both to define relevant markets and to ascertain whether the acquisition will substantially lessen competition. We agree with the district court's decision not to rely on these Guidelines. *See* 591 F.Supp. at 695–96. On the issue of market definition, a decision based on these Guidelines remains as inexact as the data gathered to make the assessment. Market definition is by its nature an imprecise task. The Justice Department's recent revisions of the 1982 market definition standards, *see, e.g.,* 49 Fed.Reg. at 26,824–25, 26,828, only strengthen our conviction that these guidelines are more useful for setting prosecutorial policy than delineating judicial standards.

### B

In determining whether Excel's proposed acquisition would violate section 7, the district court found that significant barriers restricted entry into the beef packing business. 591 F.Supp. at 707–08. Such entry barriers facilitate an oligopolist's retention of market power in a concentrated industry.

■ Excel does not dispute the relevance of the inquiry into whether entry barriers exist; it merely contests the significance of the barriers in the beef packing industry. Here again, we review the district court's findings under the clearly erroneous standard. *See United States v. General Dynamics Corp.,* 415 U.S. 486, 508, 94 S.Ct. 1186, 1199, 39 L.Ed.2d 530 (1974).

The district court heard testimony that it would cost a potential competitor anywhere from $20 to $40 million to build an integrated beef packing and fabrication plant capable of competing with Monfort or Excel. 591 F.Supp. at 707. Such a plant would require between twelve to eighteen months to plan and build. *Id.* The court considered the delay and the large capital costs significant in view of low profit margins in the industry.[12] *Id.* (quoting internal Excel report describing unlikelihood of increase in competition in light of poor profitability and large capital requirements). The court also found barriers to entry by firms wishing to acquire existing facilities; it considered especially significant defendants' own documents suggesting that suitable existing facilities are quite scarce. *Id.* Finally, the court also found that "psychological" barriers to entry existed. *Id.* at 708.

Excel objects to the district court's analysis by offering its own view about the economic realities of the industry. It argues that the court misconceived the inquiry by examining existing entry barriers in what Excel repeatedly characterizes as "the current highly competitive beef industry." *See* Appellants' Brief at 38, 41, 42. Excel speculates now, despite its own internal documents, that there is a high rate of return on capital investments in the industry. It cites figures from *Fortune* magazine about Monfort's present overall success. From these it infers that investments in new plants would also be profitable. It suggests, further, that collusion

---

**12.** Excel bolsters its argument that large capital costs do not present barriers to entry by citing the Areeda-Turner treatise. Yet Excel's quotation selectively ignores the context, in which the treatise authors do conclude that capital costs may comprise barriers to entry. *See* II P. Areeda & D. Turner, *Antitrust Law* ¶ 409e at 303–05 (1978).

will quickly lead to supracompetitive rates of return, which will in turn break down any existing entry barriers. Excel refutes the court's findings about the lack of available existing capacity by referring to its own expert's testimony, testimony that the court noted but declined to heed. *See* 591 F.Supp. at 707.

We may not retry the case here on the basis of speculative arguments. Nothing in the record suggests to us that the court's finding that entry barriers exist is clearly erroneous.

### C

Excel also urges that the district court should have considered a variety of other factors that it contends would make collusion difficult or impossible. It argues, in effect, that when a court finds that a merger would significantly increase a firm's market share in what is already a concentrated industry, the court should also look at specific competitive aspects of the particular industry to decide whether a large market share will readily translate into significant market power. Courts and scholars have disagreed on the relevance of such "other factors" to section 7 analysis. The current Merger Guidelines suggest that the Justice Department would examine these other factors in a close case. *See* Merger Guidelines § 3.4, 49 Fed.Reg. at 26,832–34 (1984).

In *United States v. Philadelphia National Bank*, 374 U.S. 321, 362–63, 83 S.Ct. 1715, 1740–41, 10 L.Ed.2d 915 (1963), the Supreme Court indicated that a merger should be presumed illegal when market share information suggests a merger will result in a significant increase in industry concentration. The Court observed that economic data on the structure of a particular market are "both complex and elusive." *Id.* at 362, 83 S.Ct. at 1741. It did allow a narrow exception, however, if there is "evidence clearly showing that the merger is not likely to have such anticompetitive effects." *Id.* at 363, 83 S.Ct. at 1741.

The Supreme Court in *United States v. General Dynamics Corp.*, 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974), clarified what evidence other than market share might be relevant to section 7 analysis. The Court approved of the district court's analysis of the structure, history, and probable future of the coal industry, and found that market share statistics were an unreliable indicator of market power because of the prevalence of long-term requirements contracts in the coal industry. 415 U.S. at 499, 501–04, 94 S.Ct. at 1194, 1195–97. The Court has continued to recognize the potential relevance of information on market structure beyond market share, *see United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 630–32, 94 S.Ct. 2856, 2874–75, 41 L.Ed.2d 978 (1974), but has offered little explanation of mitigating economic factors.

Excel seeks to avail itself of the *General Dynamics* exception by arguing that future competitive behavior in the beef industry cannot be judged from past market behavior. It complains that the district court ignored expert testimony that: many buyers of beef are large and sophisticated; many substitutes exist for beef—such as poultry, pork and ground beef; cattle supplies are cyclical; individual plant costs differ widely; and high costs prohibit companies from maintaining excess unused production facilities. These factors do not establish that past information about the beef industry is inherently unreliable, nor do they resemble the factors such as long-term contracts that the Supreme Court found relevant in *General Dynamics*. Therefore, we hold that the district court properly confined its analysis to market share statistics plus limited information on industry structure, history and probable future. *See* 591 F.Supp. at 705. Such a narrow inquiry is faithful to the Court's concerns in *Philadelphia National Bank* that merger analysis stay within predictable bounds consonant with the limits of legal and economic certainty. 374 U.S. at 362, 83 S.Ct. at 1740. The market share statistics are impressive: the court found that in 1982 four firms accounted for 52% of the fed cattle slaughtered in the relevant

geographic area. 591 F.Supp. at 706; if the acquisition of Spencer were to be permitted, Excel would have a market share of 20.4% and two firms (IBP is the leading firm) would have 44.8%. *See* R. III, Table 7. It found that in 1982 four firms accounted for 53.8% of the nation's boxed beef produced by integrated slaughter-fabricators and independent fabrication, 591 F.Supp. at 706; if the acquisition of Spencer were permitted, Excel would have a market share of 20.4% and the top two firms, IBP and Excel, would have 47.7%. *See* R. III, Table 3.

### D

Finally, Excel argues that the district court should not have attributed any significance to Cargill's extensive financial resources as Excel's parent company. *See* 591 F.Supp. at 708–09. The district court relied on *Kennecott Copper Corp. v. FTC*, 467 F.2d 67, 78–79 (10th Cir.1972), *cert. denied*, 416 U.S. 909, 94 S.Ct. 1617, 40 L.Ed.2d 114 (1974), which Excel claims is no longer valid because of subsequent changes in FTC policy. Excel urges that an acquiring firm's deep pocket is only relevant when that firm's extensive resources are likely to be used in an anticompetitive fashion. It urges us to follow the Second Circuit's analysis in *Missouri Portland Cement Co. v. Cargill, Inc.*, 498 F.2d 851, 865–66 (2d Cir.), *cert. denied*, 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974).

We need not rule on the continued validity of *Kennecott Copper* to affirm the district court's approach. Even if we were to adopt the Second Circuit's approach, Cargill's deep pocket would still be relevant to Excel's proposed acquisition. Although the district court conceded that predatory

conduct was not certain to occur, it recognized that the threat of such predation was Monfort's principal reason for trying to block the acquisition. *See* 591 F.Supp. at 710; *see also supra* section I(B) (Monfort's theory of injury to support antitrust standing); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487, 97 S.Ct. 690, 696, 50 L.Ed.2d 701 (1977) (acknowledging that an acquisition may be unlawful because it brings "a 'deep pocket' parent into a market of 'pygmies,'" assuming that a firm's antitrust injury is tied to this type of illegal behavior). We would have no difficulty concluding that Cargill's financial resources would likely be used in an anticompetitive fashion if Excel acquired Spencer Beef and then engaged in a period of predatory pricing. Indeed predation is most likely to succeed when it can be sustained long enough to drive other companies out of business, *cf.* Easterbrook, *supra*, at 267–76, 278 (describing theoretical instances of predation); a wealthy parent company would surely facilitate such sustained predation. Therefore, we find no error in the district court's consideration of Cargill's resources.

### III

Finally, Excel appeals the district court's order of February 27, 1984, holding that it violated the permanent injunction by acquiring Spencer Beef's Oakland, Iowa, plant. The court required Excel to return the plant to Spencer; we denied Excel's motion to stay that order.

Excel contends that it did not violate the spirit of the injunction by acquiring one of Spencer Beef's three plants. It urges the court to consider the circumstances surrounding the injunction as well as the language of the order.[13] We note that by

---

13. The December 1, 1983, order provided that:

"ORDER

IT IS HEREBY ORDERED that defendants Excel Corporation and Cargill, Inc. are PERMANENTLY ENJOINED from consummating the proposed acquisition between Excel Corporation, Cargill, Inc., and the Spencer Beef Division of Land O'Lakes, Inc. The defendants are further ENJOINED from undertaking any plan or entering into any agreement, the

effect of which would be to allow the acquisition, merger, consolidation, operation or in any other way permit the combination of the ownership or operation of the beef packing businesses of defendants and the Spencer Beef Division of Land O'Lakes, Inc. Judgment will enter for Plaintiff Monfort of Colorado on its claim for injunctive relief...."

591 F.Supp. at 710–11.

taking control of the Oakland plant Excel acquired Spencer Beef's *only* operating integrated beef packing and fabrication plant. Spencer's other integrated plant in Schuyler, Nebraska, has been closed since 1982 except for a brief period following Excel's take-over of the Oakland plant.[14]

■ Excel's claim that it was reasonable to acquire Spencer's major operational asset despite the court's injunction strains credulity. The court phrased its injunction to forbid the proposed acquisition that was the subject of the trial. But the court "further ENJOINED [defendants] from undertaking any plan or entering into any agreement, the effect of which would be to allow the acquisition, merger, consolidation, operation or in any other way permit the combination of the ownership or operation of the beef packing businesses" of Excel and Spencer Beef. 591 F.Supp. at 710–11. We agree with the district court that defendants should have raised this less objectionable alternative of a partial acquisition at trial if they seriously wanted to contend that the injunction ultimately granted forbade only the entire acquisition. The district court wrote the second clause of the injunction in the broadest possible way using absolute language. It hardly could have been clearer in intending to forbid any significant acquisition of Spencer Beef assets, having not been apprised of Excel's interest in a partial acquisition. Therefore, we find no error in the district court's order that Excel return the Oakland plant to Spencer Beef.

AFFIRMED.

---

**14.** Excel advances a worthy purpose argument claiming that by purchasing only the Oakland plant it enabled Spencer Beef to reopen the Schuyler plant. This argument is as irrelevant here as it is to a determination of whether a section 7 violation occurred.